IsrooR Wasservogel, Spec. Ref.
Plaintiff has been granted a separation based upon the withdrawal of defendant’s answer and a subsequent inquest taken before a Justice of this court. The amount of permanent alimony and counsel fees, together with the issues concerning defendant’s “wealth, income and standard of living ’ ’ were referred to this court, upon consent of counsel, to hear and determine (see order of Special Term, Part XII, Feb. 26, 1958, Gold, J.). Thereafter, plaintiff’s motion to punish defendant for contempt in failing to pay the amount awarded her as temporary alimony was also referred to this court (see order of Special Term, Part XII, March 30, 1959, Lupiano, J.).
Defendant does not dispute the fact that since January 16, 1959 he has not paid to plaintiff temporary alimony in the sum of $175 per week, net, as required by a prior order of a Justice of this court. In defense to the motion to punish him for contempt, however, defendant has asserted his complete financial inability to make these payments. Thus, in essence, both of the references to this court necessarily concern defendant’s 11 wealth, income and standard of living. ’ ’
Plaintiff’s counsel spent many days of trial and countless months of pretrial examination (a good part of which was unnecessary, as will be more fully discussed hereinafter) in an effort to establish that defendant was and still is a man of substantial wealth and great financial resources. There is no doubt that during the 10 years the parties lived together as husband and wife, defendant was a very wealthy man. Plaintiff and defendant then maintained a high standard of living in accordance with such wealth and his then income. They spent upwards of $60,000 a year for living expenses, employed full-time household help and a chauffeur, entertained lavishly in expensive *301 hotels and night clubs and enjoyed lengthy vacations at fashionable summer and winter resorts.
This court, however, must determine the amount of alimony defendant must pay in accordance with his financial status at the time the award is made. It is the ability of the husband to pay at this time which controls. Likewise, the relative financial condition of both parties at the present time, their age, health, necessities and obligations must also be taken into consideration (Phillips v. Phillips, 1 A D 2d 393, 394-398, affd. 2 N Y 2d 742; Grossman, New York Law of Domestic Relations, §§ 806, 807, and cases cited thereunder).
The record establishes that since 1957,. several years after defendant made an investment of approximately one-half million dollars in an amusement park known as “ Storyland Village ” in New Jersey, he has continued to suffer a complete reversal of his prior financial position. The credible proof shows that this venture, for all intents and purposes, has been a complete failure and defendant’s investment therein a total loss. As of this date, defendant and his corporations are still liable for substantial mortgage payments on account of Story-land Village, with interest payments alone amounting to more than $16,000 a year. Defendant’s financial status has deteriorated to such an extent that in 1958 he was unable to meet the payment of the installments of principal when they fell due.
Despite plaintiff’s counsel’s attempts to prove that defendant still has substantial assets, it conclusively appears from the record that at the present time defendant’s principal asset from which he can reasonably expect to receive any moneys, is his interest in Kolmer & Co., Inc. Since June 30,1957 this corporation has been wholly owned and controlled by defendant. At the hearings before this court, the issue of the actual net worth of Kolmer & Co., Inc., was explored at great length by counsel for plaintiff. Although there is little doubt that at one time defendant derived his income principally from this source, an analysis of the evidence adduced by competent and credible accountants establishes that this corporation is now operating at a deficit and has little, if any, real net worth at the present time. It is to be noted that two items carried on the books of this corporation as assets, namely, a loan to Storyland Village of $72,500 and $139,264.80 as moneys due from defendant, an officer of the corporation, are for all practical purposes, worthless assets. Thus, plaintiff’s contention that Kolmer & Co., Inc., has a substantial operating profit or a high net worth is completely without foundation and entirely illusory.
*302 Many court hours and pretrial days were needlessly spent by plaintiff’s counsel in their examination of the so-called “ Tanbro ” transaction. It is their contention that defendant, by means of various purchase and sales agreements entered into between Kolmer & Co., Inc., and Tanbro Fabrics, Inc., attempted to conceal substantial assets and inventory of the former corporation. Despite the protracted examinations of defendant, Tanbro’s officers, the books and records of both corporations involved in this alleged machination, plaintiff has failed to prove that defendant’s dealings with Tanbro were steeped in fraud or were in any other way an effort by him to conceal from the court or from plaintiff the assets and inventory of Kolmer & Co., Inc. The credible evidence merely substantiates defendant’s contention concerning the Tanbro transaction, to wit, that Kolmer & Co., Inc., purchased cotton goods from Tanbro with a guarantee against loss. The goods were sold by Tanbro for Kolmer & Co., Inc.’s account, which ultimately resulted in a loss. Kolmer & Co., Inc., then demanded and obtained from Tanbro the money it had lost on these sales pursuant to the terms of the guarantee between them. That is the effect of the entire Tanbro transaction which plaintiff’s counsel vociferously denounces as a fraud.
Plaintiff sought and obtained all pertinent information concerning these transactions. Her attempts to prove any concealment of assets by defendant was futile. It appears, however, that counsel’s inability to establish what they deemed to be irregular accounting procedures and/or a fraud by defendant only caused them, despite the court’s repeated admonitions, to unnecessarily extend and prolong their examination into this issue, thereby encumbering the record with hundreds of pages of repetitious and useless testimony and numerous unnecessary exhibits.
It is to be noted that at the very time the disputed Tanbro transactions took place, plaintiff’s accountants and attorneys were examining defendant, his corporations, and their books and records. Under these conditions, it would have been difficult for defendant to have concealed any of his assets, as is here asserted by plaintiff. Significantly, instead of the Tanbro transaction concealing assets, it, in fact, resulted in a tax saving by Kolmer & Co., Inc.
Similarly, plaintiff’s contentions that defendant “ juggled ” his bank accounts to hide his true wealth proved to be without foundation. Concededly, defendant withdrew moneys from bank accounts shortly after the award of temporary alimony to plain *303 tiff. Each of these withdrawals complained of by plaintiff, however, merely constituted the taking of funds ¡ ‘ from one pocket and placing them in the other.” Defendant has established to the satisfaction of the court that the moneys withdrawn by him from bank accounts were used to pay legitimate and necessary obligations, including personal loans and mortgage payments on Storyland Village. Nothing in the record warrants the conclusion that defendant withdrew moneys from bank accounts in order to prevent plaintiff’s counsel from ascertaining his true financial position.
In the opinion of the court, therefore, the credible testimony and documentary evidence establish that defendant’s “ wealth ” today consists of the following assets:
1 — Approximately $1,000, consisting of cash and a checking account.
2 — $500 worth of Carmel Petroleum Co., Inc., stock.
3 — Approximately $86,000 worth of bonds held in escrow by defendant’s counsel pursuant to the terms of a stockholders’ agreement between defendant and one Benjamin Levine, which was entered into at or about the time defendant obtained complete control of Kolmer & Co., Inc. These bonds, or their proceeds are not now available for defendant’s use nor will they be in the foreseeable future.
4 — Although defendant has taken no salary from Kolmer & Co., Inc., since March, 1959, on the basis of his drawings therefrom in the prior year, the court hereby fixes as an asset of defendant the sum of $12,500 per annum, net, as defendant’s salary drawings from this corporation.
5 — Storyland Village, Inc., and ftemlok Realty Corp., the fee title holder of the amusement park, are two nominal assets of defendant. These corporations, for all practical purposes, however, are valueless, particularly for the purpose of determining sources of income and the amount of alimony which defendant can afford at this time.
6 — Approximately $7,000 State of Israel bonds, part of which, defendant has stated to the court, he was compelled to sell in order to pay for the stenographic minutes of this trial.
In addition to the foregoing, defendant, in the recent past, has received the following nonrecurring assets:
1 — A $9,000 tax refund.
2 — A $2,800 refund for a credit which he had with an automobile dealer.
*304 As against the foregoing assets, the court must take into consideration defendant’s existing obligations. They consist, principally, of the following:
1 — $10,400 per annum ($200 per week) alimony to a former wife, pursuant to court order. Due to defendant’s financial condition, this amount has been reduced twice in the last six months so that defendant is currently paying alimony to his former wife at the rate of $70 per week.
2 — Pursuant to court order, defendant maintains a life insurance policy on his life payable to his former wife. The annual premium thereon is $3,400.
3 — Defendant is indebted to Kolmer & Co., Inc., in an amount exceeding $139,000. The court is aware, however, that Kolmer & Co., Inc., as above noted, is a corporation wholly owned and controlled by defendant. Thus, this “liability” of defendant will not be given great weight in determining his true financial position. Nevertheless, it is indicative of the fact that defendant today is not in the position which plaintiff has attempted to establish on the trial.
In addition to these obligations, the court must give due consideration to defendant’s personal needs, his tax liabilities, his own living expenses, and the fact that he must now maintain a separate home for himself, though it be no more than a one-room apartment. Likewise, the court must consider the fact that defendant is now a man 66 years of age, in comparatively poor health, and with little likelihood that in the near future he will again achieve the financial status and security he previously enjoyed. On the other hand, plaintiff is much younger, 47 years of age, a woman who came penniless to her marriage to defendant. After 10 years of marriage to defendant, however, she now has substantial independent resources, including approximately $50,000 worth of jewelry and silverware, linens, furniture, and other furnishings of their luxurious apartment, part of which she has already sold for $6,000. Moreover, plaintiff is a woman experienced in the business world and can reasonably be expected to be able to help support herself to some extent in the future (Phillips v. Phillips, supra, Doyle v. Doyle, 5 Misc 2d 4, 7).
Plaintiff asks for $35,000 a year as alimony. However, her claim that she requires a minimum of almost $18,000 annually “ just to maintain herself ” is an amount far greater than any which the court may allow her in view of defendant’s present critical financial position. Concededly, as already noted, while *305 the parties were married and living together, plaintiff enjoyed as high a standard of living as she now seeks to maintain. Throughout their marriage plaintiff had the use, benefit and enjoyment of defendant’s wealth and substantial income. Now, after defendant has suffered severe financial reverses, plaintiff cannot expect to live as before merely because she has obtained a legal separation from her husband. Unfortunately, from plaintiff’s point of view, she obtains no preferential claim to luxury simply because she became accustomed to it when the man who made this standard of living possible can no longer afford to maintain it. It is significant that in her statement of “ Needs ” to maintain herself, plaintiff lists several thousands of dollars for “winter and summer vacations” and $3,500 annually for clothes. Undoubtedly, plaintiff may have spent sums in excess of these amounts while she and defendant were living together. These amounts and their purposes, however, do not reflect her real “needs ” today in light of defendant’s current assets and obligations, as above set forth.
Alimony was originally devised to protect those women without power of ownership or earning resources to maintain themselves in a decent and suitable manner. It was never intended, however, as plaintiff here seeks, to assure a perpetual state of secured indolence (see Doyle v. Doyle, supra, p. 7).
Giving due consideration to plaintiff’s actual needs to maintain herself properly, and with due regard to the income, assets, obligations, health, age, and financial prospects in the imminent future of both parties (including plaintiff’s potential ability to be at least partially self-supporting), I find that plaintiff is entitled to alimony at the rate of $70 per week, the same amount now being received by defendant’s first wife. The court is well aware that this amount will, of necessity, compel plaintiff to curtail a good deal of her current expenditures. Nevertheless, nothing in the law requires a husband to maintain a wife on the same standard of living to which she became accustomed as a result of their marriage, when, as in this case, he is financially unable to do so. It should be noted that in fixing alimony at $70 per week, defendant’s legal obligations to plaintiff and to his former wife, without considering at this time defendant’s own counsel fee, as well as plaintiff’s counsel fee, amount to more than $10,500 per annum ($140 per week as alimony; $3,400 per annum for life insurance premiums). These obligations must be paid by defendant even before he can consider his own personal obligations and living expenses. To fix alimony in any greater amount at this time would, in the opinion of the court, *306 be a useless gesture, inasmuch as defendant is unable to assume a greater financial burden than the court now imposes upon him.
Plaintiff’s counsel seek $20,715 as counsel fees, $2,224.47 for disbursements, and an additional allowance of $4,935.10 for accounting services allegedly rendered in plaintiff’s behalf in the preparation and trial of this action. The court does not intend to discuss at any great length counsel’s contention that they spent more than 1,100 hours in the preparation and trial of this action, including work done on Saturdays, Sundays, holidays and after business hours. Suffice it to say that, in the opinion of the court, a good deal of such time was unnecessary and seemingly wasted, for this action, despite the legal maneuvering by them on behalf of plaintiff, is a relatively simple one, which presented, or should have presented, no unique problems to a law firm so experienced in similar matters. Many of the motions, conferences and examinations made by plaintiff’s counsel were entirely unnecessary. Defendant withdrew his answer and the actual trial of the separation action was nothing more than the usual inquest.
The minutes of the hearings before this court on the issue of defendant’s income, wealth and standard of living and the motion to punish him for contempt total more than 1,390 pages. Hundreds of pages of this record are unwarranted, unnecessary and constitute fruitless ‘1 fishing expeditions” by plaintiff’s counsel. A substantial part of the testimony is a mere rehashing of the material obtained by them on the protracted examinations before trial. The very tactics which counsel employed in the Borchard case and which were so severely criticized by the Appellate Division, First Department, in its decision therein (Borchard v. Borchard, 5 A D 2d 472, 474 et seq.) have again been utilized by them in the instant action. Their dilatory methods, the prolonged and needless examinations of witnesses and records both before and during trial, repeated adjournments and unnecessary motions served only to extend the conduct of the trial and counsel’s subsequent excessive claim for services rendered. There is no reason why defendant, even if he had the financial means, should be compelled to bear the cost of this method of preparing and trying a case.
Moreover, plaintiff’s counsel apparently overlooks the fact that an award of counsel fees in a matrimonial action is made solely for the purpose of enabling the wife to prosecute or defend the action. If she applies to the court, a wife must prove that she is without means to bear the expense of hiring counsel (Lake v. Lake, 194 N. Y. 179; Macchia v. Macchia, 243 App. Div. *307 741; Butler v. Butler, 204 App. Div. 602; Grossman, op. cit. §§ 903, 926).
While plaintiff may not be wealthy to the same extent that she claims her husband to be, nevertheless, as heretofore stated, the record shows that she owns expensive items of jewelry that were provided her by defendant, as well as silverware, linen and the proceeds from the sale of portions of their household furnishings. Thus, in view of plaintiff’s assets, and giving due consideration to defendant’s financial condition, as above set forth, and particularly in light of the fact that the necessary services rendered by plaintiff’s counsel do not warrant the fee they seek herein, plaintiff is awarded counsel fees in the sum of $3,500, which shall also be deemed to cover all allowable disbursements. No separate allowance is granted for the accounting services rendered in her behalf inasmuch as she had ample resources to provide for the same if she deemed them to be a necessary part of this trial. Defendant may pay the counsel fees herein fixed in installments of $250. The first $250 is to be paid within 10 days after service upon him of the final decree herein, together with notice of entry thereof, and $250 each three months thereafter until, the balance is fully paid.
As to the motion to punish the defendant for contempt, defendant concedes that from January 16,1959, to date, a period of 37 weeks, he has failed to pay alimony as ordered at the rate of $175 per week, net. Thus, defendant is in arrears, as of this date, in an amount exceeding $6,400. It is evident from the record that defendant at no time during the litigation of this matrimonial action was financially able to comply with an order fixing alimony at $175 per week, in addition to his other legal obligations. The only reason he consented to pay such an amount was in the hope and expectancy of obtaining a speedy trial on the merits so that permanent alimony could be fixed by the court in relation to his true financial condition. This hope and expectancy were frustrated and shattered by the constant delays and procrastinations of plaintiff and her counsel, which prolonged this matter and extended it over a two-year period, all to defendant’s detriment.
Nevertheless, defendant’s defense of his inability to pay any moneys is not substantiated by the record and, therefore, defendant must be adjudged in contempt. In view of the defendant’s dire financial straits at this time, pursuant to the provisions of section 1172-a of the Civil Practice Act, the alimony payments are reduced to the sum of $70 per week for the 37-week period in which he has been in default, and defendant *308 is accordingly fined the sum of $2,590, the amount of such arrears. Defendant may purge himself of the contempt by paying said sum of $2,590 in monthly installments of $150 in addition to the other payments fixed herein.
Settle order accordingly within 10 days on 3 days’ notice.
The above constitutes the decision of the court as required by the applicable provisions of the Civil Practice Act.