HOTEL CREDIT CARD CORPORATION et al., Suing on Behalf of Themselves and All Other Parties Similarly Situated, Appellants, *v.* AMERICAN EXPRESS COMPANY, Respondent.

First Department, May 11, 1961.

*Charles W. Merritt* of counsel (*Lord, Day & Lord*, attorneys), for appellants.

*William S. Gaud* of counsel (*James C. Peterson* with him on the brief; *Carter, Ledyard & Milburn*, attorneys), for respondent.

BREITEL, J. The question in this case is the duration of one of several obligations, in connection with its credit-card system, undertaken by the American Express Company to plaintiffs. They are corporations representing some 5,300 hotels, of which some 3,500 have entered into individual contracts with Express. (Also joined as a plaintiff, is a member hotel corporation.)

The obligations in suit were set forth in written agreements between the parties. The hotels contend that the duration of a certain Option III is indefinite, that is, it subsists for as long as Express is in the credit-card business. Express contends that the duration is only for one year.

When Express, in renewing its credit-card agreement with subscribing hotels, eliminated Option III, the hotels protested. Eventually the hotels sued for a permanent injunction to compel Express to perform its obligations. When the hotels moved for a temporary injunction, Express moved to dismiss their complaint for legal insufficiency. Special Term denied the temporary injunction and dismissed the complaint.

For reasons that will appear, the order, insofar as it dismissed plaintiffs' complaint, should be reversed and the motion denied; but, insofar as the order denied the motion for a temporary injunction, it should be affirmed.

Involved are three documents: a basic agreement between the parties; a scheduled agreement attached to the basic agreement intended for and used in execution of particular agreements by individual hotels; and a letter modification executed simultaneously with the basic agreement by Express' president. The subject matter of the agreements is the acquisition of the hotel credit-card system by Express and the use by the hotels of Express' widespread credit-card system.

The facts antecedent to the agreements are as follows: The hotels had organized and were using since 1953 their own credit-card system, known as the Universal Travelcard system. Significantly, the subscribing hotels paid no regular discount or commission on credit-card charges, but, by formula, paid discounts on slow or bad accounts "purchased" by the hotel credit-card corporation. Significantly too, there was no central billing of credit-card holders, but each holder was billed by the hotel in which he had run up charges. In 1958 Express entered the credit-card business and negotiated to take over the hotel credit-card system. The stumbling blocks were the regular discounts or commissions to be charged subscribers computed on all charges against credit cards and Express' demand that there be central billing by it of all charges against holders of its credit cards.

The difficulties were resolved in the following manner: Under Options I and II, provided in the scheduled agreement but specifically mentioned in the basic agreement, hotels could, with respect to various categories of charges, pay a varying discount of 5% or 4.5%, but with central billing. Under Option III, under the same agreements, the hotels could pay a 5% discount on all slow or bad accounts "purchased" by Express, and the hotels would also have the privilege of direct billing. There were distinct limitations of time, record-keeping, and the like, imposed on those selecting this option, so highly favorable to the hotels. On this basis the negotiations were completed; the hotels went out of the credit-card business; and Express took over their credit cards under its own system. A year later, in tendering individual renewal agreements to the hotels, Option III was eliminated by Express.

The question, as noted earlier, is whether Express undertook to extend Option III to the hotels for so long as it is in the credit-card business, or whether it was obligated so to do only for a trial period of one year. By examining the documents it becomes quickly evident that there has been a failure of draftsmanship which leaves the question in some doubt. However, under the rule that a party's pleading is to be construed in its favor it may be that the hotels will be able, upon a trial or otherwise, to establish that the complex of documents here involved was intended to create an obligation of indefinite duration with regard to Option III. Proof of the circumstances under which the agreements were made and of the negotiations leading up to the execution of the written instruments may serve to resolve any ambiguities (*O'Neil Supply Co.* v. *Petroleum Heat & Power Co.*, 280 N. Y. 50, 55–56; Restatement,

Contracts, §§ 231, 236; 3 Corbin, Contracts [1960 ed.], § 547; 10 N. Y. Jur., Contracts, § 214 *et seq.*). So too, on a parallel showing, a party may be entitled to reformation of instruments to evidence an agreement imperfectly expressed (*Hart* v. *Blabey,* 287 N. Y. 257, 262; Restatement, Contracts, *supra,* §§ 504, 507; 6 N. Y. Jur., Cancellation and Reformation of Instruments, § 22 *et seq.*).

Time indicators in the documents are contradictory.

The hotel credit-card corporation under the basic agreement agreed not to compete with Express in the credit-card business for 10 years, or for such earlier time when Express ceases to issue credit cards. On the other hand, addressed to all three options, the agreement provides that Express will not change the terms of the options for a period of one year. Yet again, the agreement provides that " [a]ll representations and agreements " shall continue in full force and effect so long as Express continues to issue credit cards. Notably, this provision is not limited to representations but refers also to " agreements ", a word expressive of obligation. But, on the other hand, the individual hotel agreement, a model of which is scheduled to the basic agreement, provides that the individual agreement is cancelable, without qualification except that it must be by written notice effective on publication of the new credit-card directory, at the option of either party, namely, the hotel or Express. Such a provision, of course, could undermine, to some degree, any continuing obligation purportedly created by the basic agreement. Then, to top it all, simultaneously with the execution of the basic agreement, the president of Express wrote a letter to the hotel credit-card corporation in which he stated as follows: " In the Travelcard Agreement we agree " not to change the terms of the Options specified in Exhibit A [form of credit extension agreement for hotels in respect of American Express Credit Cards], for one year from the date of ' the Travelcard Agreement. We hereby agree that after the period of one year specified in the above quoted provision and for the indefinite future we shall not change the discount rate of 5% provided in Option III set forth in such Exhibit A, so long as the hotels executing credit extension agreements in the form of Exhibit A will use reasonable care in extending credit and will abide by our regulations issued in connection with the American Express Credit Card in respect of checks and delinquent accounts."

Scanned literally the documents look in contradictory directions at the same time. The circumstances and the evident purposes of the agreement, nevertheless, could be suggestive of

an intention, albeit only dubiously manifested, that the critical Option III should persist beyond the duration of one year. The hotels were giving up an established credit-card system. Express was acquiring it, and Express had persistently negotiated for it. A critical barrier in the negotiations had been the issue of central billing versus direct billing. Perhaps, without the president's letter, the basic agreement might be interpreted as limiting the right to direct billing for one year; but, with the president's letter taken into consideration, it is arguable that the one-year limit was impliedly extended. Similarly, it could also be argued that it is merely illusory to agree, although dressed in words of firm obligation, to continue a 5% discount with regard to an option which is terminable at will after one year; and, consequently, that such could not be the intention.

The discernible purpose of an agreement and the circumstances surrounding its execution may properly serve as a guide to resolving apparent contradictions and defining obligations imperfectly expressed (*Aron* v. *Gillman*, 309 N. Y. 157, especially 163; 3 Corbin, Contracts, *supra*, §§ 545, 547). Evidence of the surrounding circumstances, including the preliminary negotiations and contemporaneous statements of the parties, may thus be considered in seeking the true shape of obligations undertaken, without doing violence to the parol evidence rule (*O'Neil Supply Co.* v. *Petroleum Heat & Power Co.*, 280 N. Y. 50, 55–56, *supra*; 3 Corbin, Contracts, *supra*, § 543).

Courts ordinarily cannot, of course, create obligations where none were agreed upon. But where such obligations are discoverable in the language of a written instrument, in the context in which it was written, they should not be diluted away by broad, absolving clauses (*Outlet Embroidery Co.* v. *Derwent Mills*, 254 N. Y. 179, especially 183). In the *Outlet* case, it was said inimitably by Chief Judge CARDOZO of an analogous complex of facts: ''Read the privilege of change with inflexible adherence to its form, and one turns it into nonsense.'' Thus, the provisions in the agreement purporting to give Express a nearly unlimited freedom to cancel or alter its individual credit-card agreements with the hotels may give way to the more specific provisions aimed at affording the hotels some guarantee of continued service on favorable terms (*Muzak Corp.* v. *Hotel Taft Corp.*, 1 N Y 2d 42, 46–47).

Where rights and protections are unusual, then support for their existence must be found in the language of the contract and not left to implication, at least as a general rule. Here, however, there is found in the language various provisions which provide support for the hotels' claims. Most importantly,

there is the president's letter on top of the contradictory (or obscure, if not contradictory) provisions in the basic agreement coupled with the scheduled individual agreement. All this bespeaks a patent unintended omission, one way or the other, as distinguished from an intended exclusion inferred from egregious omission.

It is, therefore, concluded that, giving the hotels the benefit of every favorable inference which may be drawn from their complaint, the complaint is entitled to stand as sufficient (*Condon* v. *Associated Hosp. Serv.*, 287 N. Y. 411, 414; 5 Carmody-Wait, New York Practice, Dismissing Pleadings, § 22, p. 26). At the same time there is evident ambiguity in the documents, arising from what are basically contradictory provisions, as distinguished from ambiguity arising from omissions, although the documents have both. The consequence, however, of contradictory provisions in the documents is that the hotels may be well advised to seek, by way of alternative or additional relief, a reformation of the documents as well as to stand on the language as presently written. This may be indicated especially by the relatively unqualified cancellation clause in the individual hotel agreement. Its complaint does not ask for such relief, but should it be so advised leave should be granted for them to amend their complaint.

There are, of course, limitations to reformation. It is available only, it would seem, in a case such as this, to make the documents conform to the actual agreement, as contrasted with reformation of the agreement itself. (*Salomon* v. *North British & Mercantile Ins. Co.*, 215 N. Y. 214, 219; 6 N. Y. Jur., Cancellation and Reformation of Instruments, *supra,* §§ 41, 42, especially pp. 588–589 and the authorities cited; see, also, *Ross* v. *Food Specialties,* 6 N Y 2d 336, 341.) Consequently, plaintiffs would be obliged to establish what that agreement was, if it is claimed that it was different from the instruments. On the other hand, to the extent that the hotels may rely on the existing language in the instruments their burden may be less heavy, because they would be merely seeking to clarify the ambiguities patently present (see, e.g., Restatement, Contracts, *supra,* §§ 231, 236; 3 Corbin, Contracts, *supra,* § 540).

In view of the passage of time and the issuance of the Express credit-card directory for the current year there does not seem to be a present urgency for granting plaintiffs a temporary injunction, as they seek. In consequence, the court should not now pass upon whether plaintiffs would ever be entitled to such a temporary injunction. If, however, the proceedings in this action are not completed in sufficient time, plaintiffs should be

free to renew their motion for a temporary injunction as the time approaches for the publication of the Express credit-card directory for the next ensuing year. In that event they would be obliged to make a showing by evidentiary proof that they can sustain their complaint either in clarifying the instruments or in obtaining their reformation, or both.

Accordingly, the order of Special Term should be modified, on the law, to the extent that it granted defendant's motion to dismiss the complaint for legal insufficiency, the motion denied, the judgment vacated, and the complaint reinstated, with costs to plaintiffs-appellants, and the order otherwise should be affirmed, on the law, the facts, and in the exercise of discretion, with leave, however, to plaintiffs to amend their complaint if they are so advised, and without prejudice to plaintiffs' renewing their motion for a temporary injunction, not sooner than September, 1961.

BOTEIN, P. J., McNALLY, STEUER and BERGAN, JJ., concur.

Order unanimously modified, on the law, to the extent that it granted defendant's motion to dismiss the complaint for legal insufficiency, the motion denied, the judgment vacated, and the complaint reinstated, with costs to plaintiffs-appellants, and the order otherwise affirmed, on the law, on the facts, and in the exercise of discretion, with leave, however, to plaintiffs to amend their complaint, if they are so advised, and without prejudice to plaintiffs' renewing their motion for a temporary injunction, not sooner than September, 1961. Settle order on notice.