**UNITED STATES of America,**
**Plaintiff,**

v.

**David JACOBS, New York Credit Men's Adjustment Bureau, Inc., Doris Kolmer, Richard Kolmer, as Executor of the Estate of Max Kolmer, deceased, and Arthur Levine, Herbert Levine and David Jacobs, as Executors of the Estate of Benjamin Levine, deceased, and Kolmer & Company, Inc., Defendants.**

**No. 63 Civ. 1329.**

United States District Court
S. D. New York.

Jan. 20, 1969.

Modified May 19, 1969.

---

1. The prayer for an award for additional attorneys' fees will be disposed of separately.

Robert M. Morgenthau, U. S. Atty., Southern District of New York, for plaintiff; Alan G. Blumberg, Brian J. Gallagher, Asst. U. S. Attys., of counsel.

David Jacobs, New York City, escrowee, defendant and defendant pro se and for defendants Richard Kolmer as Executor of the Estate of Max Kolmer, deceased, David Jacobs, Arthur Levine and Herbert Levine, as Executors of the Estate of Benjamin Levine, deceased, and Kolmer & Company, Inc.; Louis Gruss, New York City, of counsel.

Hahn, Hessen, Margolis & Ryan, New York City, for defendant New York Credit Men's Adjustment Bureau, Inc.; George A. Hahn, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Doris Kolmer; Herbert N. Bobrow, Neil A. Pollio, New York City, of counsel.

LEVET, District Judge.

The United States of America instituted this action (1) to recover judgment against defendant Kolmer & Company, Inc. on an assessment for unpaid taxes of $108,328.26 plus interest, and (2) to recover the amount of said judgment out of an escrow fund held by David Jacobs, an attorney. Jurisdiction is claimed pursuant to Title 28 U.S.C.A. §§ 1340 and 1345.

Defendant Kolmer & Company, Inc. (herein called "the corporation") does not dispute its liability for the taxes assessed. In fact, this corporate defend-

ant, as well as Richard Kolmer as executor of the Estate of Max Kolmer, deceased, David Jacobs and Ben Levine, agree with the United States that the funds held in escrow by David Jacobs should be paid to the United States to the extent necessary to satisfy said tax liability, subject only to the payment of the escrowee's expenses. The claim of Marshall, Bratter, Greene, Allison & Tucker for attorneys' fees has heretofore been paid.

Defendant Doris Kolmer, widow of Max Kolmer, claims that she is entitled to receive the sum of $16,000 (together with interest) from the escrow fund by reason of a judgment against her husband, said Max Kolmer, entered on March 3, 1961 in the office of the Clerk of New York County.

Defendant New York Credit Men's Adjustment Bureau, Inc. (herein called "Credit Men's") claims that it is entitled to 90% of said escrow fund by reason of a trust agreement, dated January 7, 1960, irrevocably assigning 90% of the amount and value of the property in said escrow fund to the defendant Credit Men's in trust for certain creditors of Max Kolmer and the corporation whose claims aggregate more than $100,000.

The case was tried to the court without a jury.

After hearing the evidence submitted by the parties, examining the exhibits, the pleadings, the briefs and Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT

THE CAPITAL STOCK SALE
AGREEMENT OF
JUNE 30, 1957

1. On or about June 30, 1957, Richard Kolmer (son of Max Kolmer), Benjamin Levine and his son, Herbert Levine, three of the four stockholders of Kolmer & Company, Inc., sold their respective stockholdings to the corporation for the following sums:

|  | Sale Price |
| --- | --- |
| Richard Kolmer | $105,794.34 |
| Benjamin Levine | $273,000.00 |
| Herbert Levine | $110,294.34 |

(Ex. 1, paras. 2–4)

The book value of the stock on January 31, 1957 was as follows:

| | |
| --- | --- |
| Richard Kolmer | $105,794.34 |
| Benjamin Levine | $211,206.13 |
| Herbert Levine | $110,294.34 |

Max Kolmer, the sole remaining stockholder, was a party to the agreement. (Ex. 1)

2. At the time of the said sale of stock, the balance sheet of the corporation as of January 31, 1957 contained no reserve with which to pay the Federal Internal Revenue Service ("IRS") if the deductions claimed by the corporation for the carry forward of pre-1954 losses of L. Saffer & Co. Inc., which had been merged with the corporation, were ultimately disallowed. (Doris Kolmer Ex. C)

3. The agreement of June 30, 1957 between the three stockholders mentioned and Max Kolmer, who then became the sole remaining stockholder, contained a provision whereby the four stockholders were to pay any subsequently determined tax liabilities against the corporation's income prior to January 31, 1957. The corporation was a party to the agreement. The liabilities of the four stockholders were to be apportioned in relation to their former holdings in the corporation as follows:

| | |
| --- | --- |
| Max Kolmer | 26.47% |
| Richard Kolmer | 23.53% |
| Benjamin Levine | 26.47% |
| Herbert Levine | 23.53% |

(Ex. 1, para. 12)

THE ESTABLISHMENT OF
THE ESCROW FUND

4. Immediately following the execution of the sales agreement but to be incorporated in it, Max Kolmer and Benjamin Levine each deposited certain

securities, merchandise and property in escrow with David Jacobs (an attorney) to secure such payments of possible additional liabilities of the corporation for taxes. As part of this agreement, Max Kolmer guaranteed payment of his son Richard's liability and Benjamin Levine guaranteed payment of his son Herbert's liability "as if Ben and Max shall each be liable for 50% of any such liabilities." Under the agreement of June 30, 1957 (Ex. 1, para. 13) identical agreements of escrow were executed by Max Kolmer and by Benjamin Levine, each dated July 5, 1957. David Jacobs, as attorney for Max and Benjamin, prepared the agreements. (Exs. 2, 3)

5. (a) The terms of the escrow agreements provided in substance that if Jacobs, the escrowee, received notice from the corporation of the assessment of taxes (as covered by the shareholders' agreement) and that one of the depositors failed to pay as agreed, etc., the escrowee was to sell securities of that defaulting party in an amount equal to the sum which he was required to pay, and turn over the proceeds to the corporation.

(b) The escrow agreement (Ex. 2), when read in conjunction with the stockholders' agreement (Ex. 1) and Benjamin Levine's escrow agreement (Ex. 3), reveals an intent of the parties to those agreements that the fund guarantee, or assure, the payment of any potential tax liabilities in order to protect the other parties to the sales agreement from transferee liability.

(c) It is obvious that the parties to the escrow agreements recognized that the government also would directly benefit from the agreement to secure any tax payments.

### THE TAX ASSESSMENT

6. By letter dated August 25, 1959, the IRS notified the corporation that it disallowed the carry over deduction claimed for the fiscal year ending January 31, 1955, and assessed a deficiency in the sum of $128,882.08 unless a petition was filed in the Tax Court within 90 days. (Ex. 4)

7. Attorneys who were engaged, with the consent of Max and Benjamin, who guaranteed the lawyers' fees, proceeded in the Tax Court but before trial recommended a settlement of $83,882.08 conditioned upon the corporation waiving any loss carry forward for the years ending January 31, 1956 and January 31, 1957. (149–155)[1] Benjamin Levine and Richard Kolmer, executor of Max Kolmer (who had died in June 1960), recommended settlement but the Creditors Committee and Credit Men's, the holder in trust of a certain alleged assignment of Max Kolmer's interest in the escrow fund, refused to approve. (153–158; Ex. 16)

8. Thereafter, the following taxes were duly assessed against the corporation pursuant to the settlement of the Tax Court proceeding:

| Year Ending | Tax | Assessed Interest | Total |
|---|---|---|---|
| (Ex. 18) 1/31/55 | $83,882.08 | $36,069.29 | $119,951.37 |
| (Ex. 17) 1/31/56 | 67,486.29 | 25,977.60 | 93,463.89 |
| (Ex. 19) 1/31/57 | 1,325.25 | 430.61 | 1,755.86 |

The corporation did not pay any portion of the foregoing taxes. Benjamin Levine paid one-half of each year's assessment of taxes and interest. (167) (See column (f) of Exs. 17, 18, 19)

---

1. Unless otherwise designated, numbers in parentheses refer to pages in the stenographer's trial minutes.

9. The balance of said assessments have not been paid, and there is presently due thereon the following (plus accrued unassessed interest):

Year Ending

| | |
|---|---|
| 1/31/55 | $59,975.69 |
| 1/31/56 | 46,731.94 |
| 1/31/57 | 878.01 |
| | $107,585.64 |

10. There are also due and owing from the corporation to the United States the following taxes (plus accrued and unassessed interest), which the plaintiff concedes are *not* within the terms of the escrow agreements:

| | Period | Tax | Interest | Total |
|---|---|---|---|---|
| (Ex. 20) | Yr. ending 1/31/58 | $406.54 | $107.70 | $514.24 |
| (Ex. 21) | 1959 FUTA | 227.20 | 1.19 | 228.39 |

## THE ASSIGNMENT TO CREDIT MEN'S

11. In the fall of 1959, the corporation fell into financial difficulties and after meetings with creditors the corporation delivered an assignment for the benefit of creditors, in escrow, to Credit Men's, which had been designated Secretary of a Creditors Committee by the corporation's creditors. The assignment was never filed. (91–93, Exs. 6, 9)

12. It appeared that Max Kolmer had personally guaranteed the indebtendess of the corporation to many creditors. Credit Men's was informed of the Jacobs' escrow and its purposes and of the tax hazard. (106–109) At this juncture the corporation agreed to pay its debts, which were entitled to priority, to pay a percentage in cash to unsecured creditors, and assigned to Credit Men's, as trustee for general creditors, its unsecured claim against Max Kolmer in the amount of $139,837.72. (Ex. 14)

13. The aforesaid assignment, among other things, recites:

(1) That Kolmer & Company, Inc. had unsecured debts of approximately $115,800.

(2) That Max Kolmer had delivered personal guarantees of payment to certain unsecured creditors of their claims against Kolmer & Company, Inc.

(3) That the Commissioner of Internal Revenue had made a determination of deficiency of $128,832.08 in respect to Kolmer & Company, Inc.'s income tax liability for the taxable year ending January 31, 1958.

(4) That Kolmer & Company, Inc. had commenced a proceeding in the Tax Court to review the determination of said tax deficiency.

(5) That the stockholders' agreement, dated June 30, 1957 (Ex. 1) provided for personal liability of Benjamin Levine and Max Kolmer for one-half of the tax deficiency.

(6) That Benjamin Levine and Max Kolmer had deposited with Jacobs in escrow certain property to secure payment of a proportionate share of any additional tax assessment against Kolmer & Company, Inc.

The assignment to Credit Men's, dated January 7, 1960 (Ex. C attached to Ex. 10), specifically states that it is subject (a) to the lien of John P. Allison, Esq., for attorney's fees, etc., and (b) "To the terms and conditions of said escrow agreement dated July 5, 1957." (p. 4 of Ex. C attached to Ex. 10)

## THE CORPORATION IS DISSOLVED

14. Max Kolmer died in June, 1960; his son, Richard, became his executor

and as such the sole stockholder of the corporation. (146) At this time the Tax Court proceeding was still pending and the escrow agreement in effect. (148) The corporation was dissolved by proclamation on December 15, 1965, pursuant to Section 203–a of the Tax Law of New York, McKinney's Consol.Laws, c. 60. (201; Doris Kolmer Ex. E)

## DORIS KOLMER'S JUDGMENT

15. Between 1957 and 1959, Max Kolmer had been sued by his wife, defendant Doris Kolmer. (See Kolmer v. Kolmer, 19 Misc.2d 298, 191 N.Y.S.2d 324) Doris Kolmer thereby became entitled to alimony of $70 per week and to $3,500 for counsel fees. Pursuant thereto, Doris Kolmer then secured a judgment against the executor in the sum of $16,000. (Doris Kolmer Ex. A)

16. In May, 1966, during the pendency of this litigation, Benjamin Levine died. Herbert Levine, Arthur Levine and David Jacobs were appointed and qualified as the executors of his estate. At the commencement of the trial, they were substituted as party defendant herein. (2–3)

## DISCUSSION
## JURISDICTION AND ISSUES BEFORE THE COURT

The sole issue in this case at this time is whether the United States is entitled to judgment directing the escrowee, Jacobs, to pay from the funds and personal property held by him in such escrow the amount of the unquestioned debt due from the corporation for unpaid income taxes, interest and penalties. Incidental to that are questions as to whether any other parties among defendants have claims prior to the United States to any portion of the escrow fund held by Jacobs.

The tax certificates submitted by plaintiff establish a prima facie case of tax liability against the corporation, and the burden was on the defendants to prove that they are erroneous. United States v. Lease, 346 F.2d 696 (2nd Cir. 1965). The assessments were made pursuant to a settlement of a pending tax court proceeding. Since the settlement was made in good faith on the advice of counsel, and since no legal rights of defendants Credit Men's or Doris Kolmer were violated by the settlement, this court sees no purpose in reopening the question of the validity of the tax assessment. The United States has a valid claim.

## THE AGREEMENTS CONSTITUTE A GUARANTEE OF PAYMENT OF ANY TAXES DUE

The escrow agreement (Ex. 2), to which this court is called upon to give effect, was made pursuant to the terms of the stockholders' agreement. (Ex. 2, p. 1) It does not stand alone. It is not a fully integrated contract but is dependent for its interpretation on the prior stockholders' agreement in which it is incorporated by reference. (Ex. 1, para. 12)

The stockholders' agreement provided, inter alia, that any additional liabilities, including taxes due the government, would be paid. There are related references in the agreement to possible tax liability and to the necessity for making provisions for their payment. (Ex. 1, paras. 11–13)

While it is true that paragraph 11 of that agreement explicitly provides that Benjamin Levine, his son Herbert, and Richard Kolmer shall indemnify the corporation or Max Kolmer, there is no mention of a similar duty of Max Kolmer to indemnify. In fact, in paragraph 12 there is a statement that Max Kolmer was depositing property under the escrow agreement for the "purpose of securing the payment [of any outstanding tax liability of the corporation]."

The phrase, "securing the payment," usually is taken to mean to assure, guarantee, or make certain, payment of a debt or obligation. See "Secure a payment," Black's Law Dictionary, 4th ed.,

1951; "To secure," Ballentine: Law Dictionary (1948 ed.).

The escrow agreement, when read in conjunction with the stockholders' agreement and Benjamin Levine's escrow agreement (Ex. 3), implies a promise on the part of Max Kolmer to guarantee or assure Benjamin Levine and his son Herbert that the potential tax liabilities would be paid. In return, Benjamin Levine established his escrow fund.

It is significant that all of the parties to the agreement have requested that the court direct that this promise be effectuated.

The intent of the parties in setting up the escrow fund was to guarantee that the potential tax liability be paid. The intent to guarantee payment rather than simply to reimburse the corporation is clearly to be inferred without extrinsic evidence. Since Max Kolmer obtained complete control of the corporation upon his purchase of the stock, he would have had no reason to make himself an indemnitor of the corporation, which was but an extension of himself. Thus, to construe the escrow agreement solely as an indemnity agreement between Max Kolmer and the corporation would seem contrary to common sense.

Moreover, it is apparent from the stockholders' agreement that the parties, for all of their superficial denial in paragraph 10, were aware that an extremely large tax claim might be assessed against the corporation (Ex. 1, paras. 11–13) and that their withdrawals from the corporation's assets at least created a doubt as to whether such a claim could be paid by the corporation. Transferee liability might well have been asserted against them. See United States of America v. 58th St. Plaza Theatre, Inc., 287 F.Supp. 475 (S.D.N.Y.1968). It is evident that they wished to protect themselves against such a contingency. Their concern obviously was not the indemnification of the corporation, since with the stockholders' agreement they had severed all financial interest in the welfare of the corporation. Self-interest demanded the payment of any taxes due, and the Kolmer escrow fund was set up to achieve that end.

## EXTRINSIC EVIDENCE IS ADMISSIBLE AS AN AID TO THE INTERPRETATION OF THE AGREEMENTS

The court is not limited by the language of the agreements in its attempt to ascertain their effect. It would seem that federal law governs the applicability of the parol evidence rule in this case. Where a federal question is presented, and jurisdiction is not based on diversity, federal law governs. Moore, Federal Practice, ¶ 0.313, p. 3504; Shackelford v. Latchum, 52 F.Supp. 205, 207 (D.Del. 1943); United States v. Bethlehem Steel Co., D.C., 215 F.Supp. 62, 68, n. 12. See also Allen v. Werner, 190 F.2d 840 (5th Cir. 1951); Jones v. United States, 96 F.Supp. 973 (D.Colo.), aff'd 194 F.2d 783 (10th Cir. 1952); Cf. United States v. L. N. White & Co., Inc., 359 F.2d 703, 714, n. 16 (2nd Cir. 1966). Jurisdiction here is based not on diversity but on the claim of the United States for taxes under 28 U.S.C.A. §§ 1340 and 1345. Smith v. Bear, 237 F.2d 79 (2nd Cir. 1956), the sole case cited by defendants to support their contention that the New York, rather than the federal, parol evidence rule should be applied, was a diversity action and, hence, inapplicable.

The applicable federal law holds that evidence of the surrounding circumstances, intent and purposes is admissible to assist in interpreting a written agreement. Asheville Mica Company v. Commodity Credit Corp., 335 F.2d 768 (2nd Cir. 1964). The parol evidence rule "comes into operation only when the meaning of that which may not be varied or contradicted is determined." 335 F.2d at 770. See also Union Ins. Soc. of Canton, Limited v. William Gluckin & Co., Inc., 353 F.2d 946 (2nd Cir. 1965).

Even if New York law were held to govern, the extrinsic evidence would

still be admissible. Under New York law, where a written agreement is ambiguous or uncertain in any respect, evidence of the surrounding circumstances, intent and purposes of the parties in making that contract is admissible for purpose of construction. M. O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 19 N.E.2d 676 (1939). The treatises on New York law are in accord on this point. Mottla, New York Evidence—Proof of Cases (2d ed.) states in § 154 at p. 173:

> "If however, the writing is ambiguous as to the meaning of the language employed, or is ambiguous by reason of unexpressed terms, extrinsic evidence is admissible to show the meaning intended by the parties."

Richardson, Evidence (9th ed. 1964) states in § 601 at p. 607:

> "Parol evidence of the circumstances leading up to, and attending the execution of the writing is admissible to explain a doubtful meaning. In no other way may it be possible to ascertain the intention of the parties."

Defendants Credit Men's and Doris Kolmer urge that this court exclude all extrinsic evidence and read the escrow agreement to be solely an obligation on the part of Max Kolmer to indemnify the corporation only after it actually pays the assessed taxes. Given the present situation and the status of the corporation, such a construction would not provide this court with the necessary information to make a final disposition of plaintiff's claims to the escrow fund.

Although the escrow agreement contains specific instructions as to the manner and time of termination of the agreement (par. 2), no provision is made in the terms of the escrow agreement for the disposition of the fund in the light of present events. Nothing is said about the possibility that the taxes may be assessed, and yet the corporation may not be able to pay them, a fact which was clearly apparent. Indeed, paragraph 2 of the agreement would seem to prevent final disposition of the fund in circumstances where "contest or assessment is pending." (Ex. 2, para. 2(b)) Thus, it would appear that consideration of the escrow agreement by itself merely discloses ambiguity or at least imperfectly expressed obligations and thus permits recourse to extrinsic evidence to determine the intent of the parties. Hotel Credit Card Corp. v. American Express Co., 13 A.D.2d 189, 214 N.Y.S.2d 921 (1st Dept. 1961); Kalmon Dolgin Co., Inc. v. Walnut Lanes, Inc., 27 A.D.2d 843, 278 N.Y.S.2d 158 (2nd Dept. 1967). Hence, it is unnecessary for this court to decide whether federal or New York state law governs the question of parol evidence since the extrinsic evidence in this particular case is admissible as an aid to interpretation of the agreement under both laws.

## DAVID JACOBS' TESTIMONY SUPPORTS THE COURT'S INTERPRETATION OF THE ESCROW AGREEMENT

This court's construction of the escrow agreement is supported by the extrinsic evidence presented by plaintiff. Defendants Credit Men's and Doris Kolmer have offered no conflicting evidence.

The testimony of David Jacobs, escrowee and attorney for the parties, revealed that the original draft that he prepared for the stock buyout contained no mention or provisions for escrow funds. Upon attending a conference with an attorney-accountant, Irving Weinstein, the parties were informed of the possibility of transferee liability. As a result a decision was reached to establish escrows to insure that the taxes would be paid so as to protect the former stockholders, particularly Benjamin Levine. (66–72)

Contrary to the contention of defendant Doris Kolmer, Jacobs has no monetary interest in the success of the government's action. In fact, Jacobs' law firm is one of the unsecured creditors which Credit Men's is attempting to protect.

(Ex. 10)   If anything, the weight of his testimony is counter to his financial interests.

Jacobs, while testifying, appeared to this court to have answered truthfully and as comprehensively as he was able. From his demeanor and the surrounding circumstances, this court finds no reason to doubt his testimony.   Jacobs' testimony was consistent with all of the evidence submitted during the course of the trial, including the deposition of Benjamin Levine (285, 290), the revealed practical construction of the parties, and even the expressed understanding of the defendant Credit Men's.

## PRACTICAL CONSTRUCTION OF THE AGREEMENT BY THE PARTIES

█   Where agreements are ambiguous or obligations imperfectly expressed it is proper not only to admit parol evidence of the circumstances and negotiations prior to execution, but also, if necessary, to look at the practical construction given the agreement subsequent to execution.   Kalmon Dolgin Inc. v. Walnut Lanes, Inc., supra.

Though the terms of the escrow agreement required that the escrowee notify the corporations issuing the stocks and debentures placed in escrow of the existence of the new arrangement, this was not immediately done.   As a consequence, Max Kolmer at first continued to receive direct payments on some of the bonds in escrow.   It should be noted that the escrowee, Jacobs, felt compelled under the terms of the agreement to seek the approval of Benjamin Levine, rather than of the corporation, for this inadvertent diversion of funds.   (Ex. 24; 194, 211, 270, 274, 289)   This action is strong evidence that Max Kolmer's escrow fund was construed by the parties for the protection of Benjamin Levine rather than for that of the corporation; it is further support for this court's interpretation of the escrow agreement as a guarantee of payment of the taxes for the protection of Levine from transferee liability.

## THE INTERPRETATION BY CREDIT MEN'S

It is particularly noteworthy that Credit Men's adopted this interpretation. The trust agreement dated January 7, 1960, pursuant to which Max Kolmer made his 90% assignment of the escrow fund to Credit Men's recounts that Kolmer agreed to be "personally liable" for the taxes, and that he established the escrow fund "for the purpose of securing the payment" of his share of those taxes. (Ex. 10–C)

In its letter dated January 15, 1960, which was sent to solicit consent of the creditors to the settlement plan, Credit Men's stated:

"* * *   The Committee *ascertained* that this escrow fund arose out of the following circumstances: that in June 1957, Max Kolmer and a former stockholder of the debtor entered into an agreement providing that each of them should be personally liable for the payment of one-half of the amount of any additional assessment for United States income taxes against the debtor resulting from the operation of the debtor's business during certain prior periods; *that each of them thereafter deposited property in escrow with David Jacobs, Esq. for the purpose of securing the payment of the proportionate share of each of them of any assessment of additional United States income taxes against the debtor * * * *;*

that *in the event* the debtor prevails in the Tax Court, Max Kolmer will be entitled to the return of his property in the escrow fund, after the deduction of certain court expenses and attorney's fees.

"* * *   [*if*] the [corporation] fully prevails in the Tax Court proceeding *so that the escrow fund becomes available for creditors*, [additional payments would be available on the creditors' claims]."   (Ex. 11) (Emphasis added)

In its January 18, 1960 letter from Mr. George Hahn, then and now counsel

for Credit Men's, there is a reference to "the property which [Max Kolmer] deposited in escrow with David Jacobs, Esq., to secure payment of any tax deficiency growing out of the operations of [the corporation]." (Ex. 25)

Exhibits 10–C, 11 and 25 clearly establish that Credit Men's interpreted its rights in the assignment of the escrow fund as subject to success of the corporation in defeating the government's claim in the Tax Court. They support the testimony of David Jacobs which revealed the purpose of the assignment to be merely a measure designed to prevent any unjust enrichment of Max Kolmer at the expense of the creditors. It was recognized that without some provision for inclusion in the creditors' settlement of Max Kolmer's rights in the fund, and in the event that the corporation should defeat the IRS claims, then very substantial assets would revert to Max Kolmer. The creditors thought this inequitable where they were asked to accept less than full payment in settlement with the corporation on debts induced by Kolmer's personal guarantee. (106–109)

Since this court has found that Credit Men's took its assignment of the residual rights in the escrow fund with full knowledge of the purpose of the escrow agreement, this court cannot equitably permit Credit Men's to now attack and void the conditions precedent to its rights to the fund.

## THE ASSIGNMENT OF
## THE ESCROW

█ The assignment to Credit Men's of 90% of Max Kolmer's interest in the escrow fund is, of course, subject to the terms of the escrow agreement. The same is true of Max Kolmer's remaining 10%. The interest and rights of an assignee can be no greater than that of the original assignor. See Federal Heating Co. v. Buffalo, 182 A.D. 128, 170 N.Y.S. 515 (1918), aff'd 229 N.Y. 540, 129 N.E. 906 (1920).

It is evident that the government's rights to the escrow fund are superior to that of the other defendants.

### A. Max Kolmer's Contractual Obligation to Benjamin Levine

Max Kolmer entered into an agreement with Benjamin Levine whereby he established an escrow fund for the payment of the corporation's taxes. Max Kolmer, by the terms of the agreement, could not create a new, prior interest to that of the United States without the consent of Benjamin Levine. Such consent was never given. The executor (and son) of Benjamin Levine now seeks to enforce that valid and binding agreement.

### B. The Government as a Third Party Beneficiary

Furthermore, the agreements created a third-party interest, i. e., the government's.

█ It is well settled law that a third party beneficiary may enforce a contract. Lawrence v. Fox, 20 N.Y. 268 (1859). If the terms of the contract require the conferring of a benefit upon a third person, then such a benefit is to be considered as contemplated by the parties and invokes a third party beneficiary right, even though the major motivation for the contract may be the parties' own advantage. Durnherr v. Rau, 135 N.Y. 219, 32 N.E. 49 (1892). While the true impetus for Max Kolmer's escrow agreement was the protection of Benjamin Levine, it is patent that Max Kolmer recognized that the payment of taxes from the escrow fund would be of direct benefit to the government, even though this was motivated by other factors of protection of the stockholders from transferee liability.

Credit Men's has cited National City Bank of N. Y. v. Berwin, 240 App.Div. 550, 270 N.Y.S. 678 (1st Dept. 1932) and Atlantic Refining Co. v. Continental Cas. Co., 183 F.Supp. 478 (W.D.Pa.1960), in an attempt to negative the status of the

government as a third party beneficiary to the escrow agreement. (Credit Men's Memorandum in Support of its Proposed Findings of Fact and Conclusions of Law, pp. 23–24) These cases hold that an indemnity agreement does not ordinarily create third party beneficiary interest in the creditor of the indemnitee. Since this court has found that Max Kolmer's escrow fund was established to *guarantee* or assure payment of the taxes, these determinations are inapplicable. Thus the agreements (Exs. 1–3) imply a promise on the part of the escrowee to use the funds in escrow to pay any taxes owing to plaintiff where the depositor has defaulted.

The position of Credit Men's may be a laudable attempt to create funds for payment of certain classes of creditors of the corporation but it is insufficient to support any basis for it to supersede the government's claim. The same is true of Doris Kolmer's claim. Since this court has found that the escrow agreement calls for the payment of any outstanding taxes due in the period prior to January 31, 1957, these payments must be made from the fund prior to any other disposition.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the claims of plaintiff United States of America

(i) for judgment against defendant Kolmer & Company, Inc. for taxes assessed and unpaid plus interest;

(ii) for an order authorizing and directing the escrowee, David Jacobs, to pay said taxes and interest out of the Max Kolmer escrow fund. 28 U.S.C. §§ 1340, 1345;

(iii) all parties necessary to a determination of the claims of the United States were made parties hereto.

2. Plaintiff, United States of America, is entitled to judgment against defendant Kolmer and Company, Inc. for the following assessed and unpaid taxes and interest plus accrued and unassessed interest:

| Period | Tax plus Assessed Interest |
|---|---|
| January 31, 1955 | $ 59,975.69 |
| January 31, 1956 | 46,731.94 |
| January 31, 1957 | 878.01 |
| TOTAL | $107,585.64 |

3. Plaintiff, United States of America, is entitled to an order authorizing and directing the escrowee, David Jacobs, to pay the taxes and assessed interest due from Kolmer & Company, Inc. for the periods January 31, 1955, January 31, 1956 and January 31, 1957, as set forth in Conclusion of Law No. 2, in the amount of $107,585.64 plus accrued and unassessed interest out of the funds and property held in escrow by him.

4. Plaintiff, United States of America, is entitled to judgment against defendant Kolmer & Company, Inc. for the following assessed and unpaid taxes plus accrued interest:

| | |
|---|---|
| January 31, 1958 | $514.24 |
| 1959 | 228.39 |
| TOTAL | $742.63 |

5. Plaintiff, United States of America, is entitled to recover the taxes and interest due from Kolmer & Company, Inc. for the periods January 31, 1958 and 1959, as set forth in Conclusion of Law No. 4, to the amount of $742.63 plus accrued interest out of such assets of Kolmer & Company, Inc. as may be available to it. This judgment is not chargeable against the escrow fund.

This court is not directing separate judgment in favor of the United States of America for any relief at this time under Rule 54(b), F.R.Civ.P., nor is this court certifying this interlocutory order as appealable. Final judgment will be withheld until jurisdiction over any other claims of any parties to the escrow fund is determined, and if jurisdiction

is upheld, until after determination of the disposition of the balance of the fund. All matters of costs will be deferred pending final disposition.