**BANQUE DE PARIS ET DES PAYS–BAS, Plaintiff,**

v.

**AMOCO OIL COMPANY, Defendant.**

**No. 82 Civ. 4441 (ADS).**

United States District Court,
S.D. New York.

Oct. 31, 1983.

Wender, Murase & White, New York City, for plaintiff; Lance Gotthoffer, Peter J. Gartland, Alden Myers, Cory D. Heith, New York City, of counsel.

Townley & Updike, New York City, for defendant; James K. Leader, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

 The federal courts enforce arbitration agreements in the wholehearted spirit intended by Congress. In considering a motion to compel arbitration or to stay judicial proceedings pending arbitration, a district court is limited to satisfying itself that the parties reached an agreement to arbitrate and that a party has failed to perform that agreement. The court may not even consider whether the nonperforming party has a valid defense to arbitration, such as laches; nor may it permit a party bound by an arbitration agreement to evade its obligations by attempting to enforce its rights through alternative remedial mechanisms. But the threshold inquiries allocated to the court must properly be performed, as they reflect the ultimate contractual source of the duty to arbitrate. A court may not force a party to arbitrate when ordinary contract principles indicate that it has not agreed to do so.

 In this case, the assignee of a receivable under a contract containing a broad arbitration provision is attempting to avoid arbitrating the account debtor's alleged right to set off against a conceded liability because of the assignor's default in a subsequent transaction. Whether the assignee has obligated itself to arbitrate this dispute turns upon the reach of the assignee's contractual obligations. Normally, the assignee is bound to arbitrate all disputes, if that is the remedial mechanism agreed upon by the assignor. Nevertheless, as explained below, the assignee of a security interest may be able to establish that it has refused to agree to arbitrate subsequent claims by giving proper notice of the limited nature of its involvement, or by obtaining a separate and legally sufficient agreement with the account debtor that the debt-

or will pay without asserting offsets or counterclaims. But the assignee in this case cannot establish that it gave proper notice or secured the necessary agreement, so it cannot avoid the normal contract rule requiring arbitration. The action must therefore be stayed pending arbitration.

### I. *Factual Background.*

On June 3, 1981, defendant Amoco Oil Company ("Amoco") entered into an "exchange" agreement with Quasar Petroleum, Ltd. ("Quasar"), an independent oil trader. A telex dated May 9, 1981, embodies the two-part final agreement, which Amoco referenced as P/S–81–056X. (Exhibit 1, Composite of Affidavits and Exhibits.) Part I provided that Amoco would sell to Quasar a certain quantity of foreign crude oil at a specified price per barrel, while Part II provided that two months later Amoco would purchase from Quasar the same quantity of foreign crude oil at the same price. The arrangement enabled Amoco to show a stronger working capital position by shifting assets to cash from inventory and yet be assured of oil at a specific price during a specific period. At the same time, it enabled Quasar to assume the risks and potential benefits of price fluctuations during that period. For example, Quasar could profit by selling the first shipment to another buyer at a higher price than it had paid Amoco, or by repurchasing the second shipment at a lower price than it would receive from Amoco. Of course, Quasar also could lose on one or both parts of the contemplated transaction.

The contract was one of a series between the companies, by each of which Quasar agreed to buy in excess of ten million dollars worth of oil. Since the purchases necessary to perform the contracts were several times greater than its net worth, Quasar required financing, which it often arranged to obtain from plaintiff Banque de Paris et des Pays-Bas ("Paribas").

The terms of Part I of P/S–81–056X required Quasar to post a letter of credit in Amoco's favor before Amoco sold Quasar the first shipment of oil. When Amoco

delivered the appropriate amount of foreign crude oil to Quasar, the companies completed the Part I exchange of funds for bills of lading without problem.

Beginning in August 1981, however, communications between Amoco and Quasar evidence alterations in Part II of P/S–81–056X to allow Quasar to substitute domestic crude oil for foreign and to make delivery at a later date and for a different price. Nothing in the record makes clear how or why these changes were negotiated and adopted. At any rate, Quasar eventually delivered the oil in three monthly shipments commencing in March 1982. The payment terms of Part II, in which Quasar was seller and Amoco buyer, did not require a documentary exchange with payment on receipt of bills of lading but rather permitted Amoco to pay by telegraphic transfer on receipt of invoices. To finance its purchase of oil for resale to Amoco under the terms of Part II, Quasar obtained a loan from Paribas. The loan was secured by a preexisting assignment to Paribas of Quasar's accounts receivable on the exchange agreement, including the proceeds that would become due under Quasar's existing and future contracts for the sale of crude oil. General Security Agreement, Exhibit 9. Paribas also demanded of Quasar that Amoco either open a letter of credit in Quasar's favor or execute a separate document which Paribas called an "undertaking." This "undertaking" would take the form of a telex in which Amoco stated that it would pay immediately available funds into Paribas for the oil it received from Quasar.

Prior to each resale of oil to Amoco by Quasar and each loan by Paribas to Quasar, Paribas received a separate "undertaking" from Amoco confirming the transaction and containing the words "payable by telegraphic transfer into Banque de Paris et des Pays-Bas." Exhibits 18, 19, 23. Indeed, because it failed to include these words, Amoco's first such telex had been deemed unsatisfactory by Paribas. Patterned on wording suggested by Paribas and Quasar, the replacement telex included the requisite phrase, but simultaneously deleted language in the first telex to the effect that payment would be made "without offset or counterclaim." *Compare* Exhibits 16 & 18, *with* Exhibit 17.

Quasar completely performed its obligations under the altered 1981 exchange agreement. Later, however, financial difficulties forced Quasar to advise Amoco that it would be unable to perform according to a subsequent exchange agreement executed by them on April 16, 1982, and referenced by Amoco as P/S–82–036X. In response, Amoco withheld $3,804,000 due Quasar on its May 1982 oil shipment as a setoff against damages Amoco claimed to have suffered because of Quasar's anticipatory breach of P/S–82–036X. Quasar subsequently defaulted on its loan from Paribas, which then initiated this action.

Paribas seeks to recover the $3,804,000 from Amoco either as an assignee of Quasar's accounts under Section 9–318 of the Uniform Commercial Code, or because of the "undertakings" executed by Amoco, which Paribas construes as separate and direct promises to pay Paribas for the oil received from Quasar. Amoco denies having made any direct promise to Paribas, and argues that in any event all of Paribas's claims are subject to an arbitration provision contained in the original exchange agreement, P/S–81–056X. Amoco therefore moves to dismiss, or alternatively to stay the present action and compel arbitration.

The Federal Arbitration Act applies to federal adjudication of controversies arising out of contracts evidencing transactions in interstate or international commerce. 9 U.S.C. §§ 1, 2; *Bernhardt v. Polygraphic Co. of America, Inc.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1955). The Amoco-Quasar agreement is plainly such a contract. The Act directs that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an

agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had.... 9 U.S.C. § 3. Under the Act, "federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability." *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1211 (2d Cir.), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972); *Metro Industrial Painting Corp. v. Terminal Construction Co.*, 287 F.2d 382, 385 (2d Cir.1961); *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402 (2d Cir.1959), *cert. granted,* 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, *dismissed,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960).

 In determining the arbitrability of a dispute and thus the appropriateness of a stay, "the federal policy [is] to construe liberally arbitration clauses, to find that they cover disputes reasonably contemplated by [the contractual] language, and to resolve doubts in favor of arbitration." *Metro Industrial,* 287 F.2d at 385. Furthermore, the federal court may not wander from the narrow issue of arbitrability—whether a particular issue is "referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. The Supreme Court has even refused to allow a federal court to consider the issue whether a contract containing an arbitration clause had been fraudulently induced, holding that "in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1966). The duty to arbitrate arises from contract, so the trial court necessarily has the authority to consider whether a valid arbitration clause binds the parties and whether the dispute falls within the scope of the clause. *See Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir.1983); *McAllister Bros., Inc. v. A & S Transportation Co.*, 621 F.2d 519, 522 (2d Cir.1980). In addition, the moving party must produce some evidence which tends to establish the merits of a claim. *Engi-*

*neers Association v. Sperry Gyroscope Co.*, 251 F.2d 133 (2d Cir.1957), *cert. denied,* 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958). But once the federal court is "satisfied that the issue ... is referable to arbitration," 9 U.S.C. § 3, all other issues, including the defenses to and ultimate merits of the claim, are reserved for the arbitrator.

## II. *Existence of an Agreement to Arbitrate the Dispute.*

 Paribas claims that no agreement to arbitrate between Amoco and Quasar exists, because they so radically altered the original understanding as to have formed a new and distinct contract which did not include an arbitration provision. In the contract from which Paribas derives its status as assignee of Quasar's right to payment, however, exchange agreement P/S–81–056X, Amoco and Quasar expressly incorporated by reference the Amoco General Provisions, which include a broad arbitration clause stating that "[a]ny controversy or claim arising out of or relating to this agreement or breach thereof shall be settled by arbitration." Exhibits 5, 6. The parties did restructure their agreement, but each revision was indexed "P/S–81–056X." Exhibits 1, 2, 4. Amoco confirmed the delivery against which it exercised its alleged right of setoff in a telex of Feb. 3, 1982, which also expressly made clear it was "under Amoco contract number P 81–056X." Exhibit 15. It is a basic principle of contract law that each new contract in an ongoing commercial relationship includes as many of the terms of the previous agreement as the parties do not abrogate. *See, e.g.,* 22 N.Y.Jur.2d *Contracts* § 412, at 329–330 (1982). Quasar, too, believed it delivered pursuant to the original contract, as its provisional invoices indicate, Exhibits 20, 25, 26, and has itself demanded arbitration. Finally, where a contract contains a broadly worded arbitration clause, the issue of the continuing validity of the contract is for the arbitrator to decide. *McAllister Bros.*, 621 F.2d at 522.

III. *Applicability of the Agreement to the Assignee Paribas.*

The inquiry in the present case, however, does not end here because Paribas, the assignee of Quasar's right to payment under P/S–81–056X, claims it was not a party to and therefore may not be compelled to arbitrate under the Amoco-Quasar agreement. Amoco contends that Paribas must arbitrate any dispute that Quasar would have been required to arbitrate, because the rights of an assignee can be no greater than those of the original assignor. *United States v. Jacobs,* 304 F.Supp. 613, 622 (S.D.N.Y.1969).

▮▮▮ Arbitration is a matter of contract, so a party may be compelled to arbitrate a dispute only if it has agreed to arbitration. *United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *Prudential Lines,* 704 F.2d at 63; *McAllister Brothers,* 621 F.2d at 522. Paribas never expressly agreed to arbitrate, but it may be obliged to do so, if warranted under ordinary contract principles. See *A/S Custodia v. Lessin International, Inc.,* 503 F.2d 318, 320 (2d Cir.1974); *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir.1960). To determine the circumstances under which the obligations of an arbitration agreement will extend to a nonsignatory and to what extent, we look to the federal common law of contracts, for which the Uniform Commercial Code provides guidance. *See, e.g., United States v. Wegematic, Inc.,* 360 F.2d 674, 676 (2d Cir.1966) (Friendly, J.); *Beromun Aktiengesellschaft v. Societa Industriale Agricola "Tresse,"* 471 F.Supp. 1163, 1169–70 (S.D.N.Y.1979); *see also Prima Paint,* 388 U.S. at 399–400, 87 S.Ct. at 1803–1804; *Robert Lawrence,* 271 F.2d at 409. *But see Farkar Co. v. R.A. Hanson Disc, Ltd.,* 441 F.Supp. 841, 845 (S.D.N.Y.1977), *aff'd as modified,* 583 F.2d 68 (2d Cir.1978), *modified on rehearing,* 604 F.2d 1 (1979).

▮▮▮ Were Paribas an assignee of the contract between Amoco and Quasar, it would no doubt be required to arbitrate this dispute. Paribas correctly contends, however, that it is not an assignee of Qua-

sar's contract with Amoco, but merely the assignee of a security interest in the receivable created by Quasar's performance. Therefore, Paribas argues, it did not assume Quasar's duty to perform and is entitled to collect what Amoco owes Quasar without arbitration. The assignee of a security interest, receivable, or other right to payment under a contract does not, however, automatically take the interest or receivable free of all contractual limitations agreed to by the assignor and the account debtor. While Paribas could not be forced, for example, to undertake its assignor's duty of performance, it does not acquire an absolute right to payment under contract P/S–81–056X without regard to the contract's remedial procedure.

The parties have found no federal decision squarely holding that the assignee of a security interest in a receivable must arbitrate if the underlying contract of sale so provides. But the case law supports the basic principle that an assignee or other party whose rights are premised on a contract is bound by the remedial provisions bargained for between the original parties to the contract. Courts in this circuit have held, for example, that a mortgagee seeking to enforce its rights under the mortgagor's insurance contract is bound by the arbitration clause, *Wells Fargo Bank International Corp. v. London Steam-ship Owners' Mutual Insurance Association,* 408 F.Supp. 626, 629 (S.D.N.Y.1976); that the assignee of a non-negotiable note given in payment of a contract obligation containing an arbitration clause may be obligated to arbitrate, *Netherlands Curacao Co., N.V. v. Kenton Corp.,* 366 F.Supp. 744, 746 & n. 3 (S.D.N.Y.1973); that an assignee of a contract containing an arbitration provision may become party to the provision, *Fisser v. International Bank,* 282 F.2d 231, 233–35 & n. 6 (2d Cir.1960); and recently that "an assignee of a claim takes it with whatever limitations it had in the hands of the assignor," *Caribbean Steamship Co. v. Sonmez Denizcilik Ve Ticaret, A.S.,* 598 F.2d 1264, 1266–67 (1979).

The Uniform Commercial Code differentiates between a "normal commercial assign-

ment, which substitutes the assignee for the assignor both as to rights and duties, and a financing assignment in which only the assignor's rights are transferred." U.C.C. § 2–210(4) & Official Comment 5. The UCC makes explicit, however, that "the rights of an assignee are subject to . . . all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom." U.C.C. § 9–318(1)(a). This principle applies to arbitration provisions, which would be of no value if a party "could escape the effect of such a clause by assigning a claim subject to arbitration between the original parties to a third party." *Hosiery Manufacturers' Corp. v. Goldston*, 238 N.Y. 22, 28, 143 N.E. 779, 780 (1924). Even an assignment only of contract "rights" not entailing any duty of performance, *see* U.C.C. § 2–210, Official Comment 5, must be deemed to include the bargained-for remedial procedure. *See* U.C.C. § 1–201(36) (defining "rights" to include "remedies"). Under the Code, moreover, and in New York where the UCC has been adopted, an assignee is entitled to enforce an arbitration clause as one of the rights acquired by assignment, *see In re Lipman (Haeuser Shellac Co.)*, 289 N.Y. 76, 81, 43 N.E.2d 817 (1942); *Tanbro Fabrics Corp. v. Deering Milliken, Inc.*, 35 A.D.2d 469, 471, 318 N.Y.S.2d 764, 766 (1st Dept. *aff'd*), 29 N.Y.2d 690, 325 N.Y.S.2d 419 (1971), and may likewise be forced to arbitrate, *see Blum's Inc. v. Ferro Union Corp.*, 36 A.D.2d 584, 318 N.Y. S.2d 414, 415 (1st Dept.), *aff'd*, 29 N.Y.2d 689, 325 N.Y.S.2d 418 (1971) ("An assignee who has taken over the rights of an assignor is bound to an arbitration clause in the assigned contract."). At least one lower court has squarely held that a lender who takes an assignment of accounts receivable as security for a loan is required to follow the remedial procedure specified in the assigned contract. *Cutting Room Appliances Corp. v. National Bronx Bank*, 97 N.Y.S.2d 363 (Sup.Ct.Bronx Cty.1950).

Paribas attempts to avoid this rule by arguing that Amoco had notice of the assignment and therefore cannot assert any defense. To the extent this argument is based on the claim that Amoco may not assert defenses or claims arising *after* it received notification of the assignment it states a correct principle. The U.C.C. expressly permits the account debtor to assert, in addition to defenses and claims arising from the contract assigned, "any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment." U.C.C. § 9–318(1)(b). In the present situation, a dispute about any such claim would properly be the subject of arbitration, but only if it arose prior to Amoco's receipt of notice of the assignment. This result ensues not only from the important interests served by ordinary contract law, but from federal principles as well. By giving notice under Section 9–318(1)(b), the assignee also makes clear its refusal to become a party to the underlying agreement between the assignor and the debtor, insofar as that agreement provides a remedial mechanism (arbitration) to enforce rights and duties no longer enforceable in *any* forum. Amoco has never controverted the validity of Quasar's claim of delivery. Its only defense to payment is its setoff under a subsequent exchange. Paribas is bound by the terms of the original contract, including the obligation to arbitrate. But that obligation means nothing standing alone. It requires Paribas to arbitrate only those claims and defenses that the account debtor is free to assert, and Section 9–318(1)(b) makes clear that Amoco may not assert any defense or claim of the account debtor that accrued after Amoco received notification of the assignment. *See id.*, Official Comment 1 ("an assignee is subject to all . . . claims [arising independently of the contract assigned] which accrue before, and free of all those which accrue after, the account debtor is notified").

The parties hotly dispute when, if ever, adequate notice was given. That Amoco received notice "at least by the time the complaint herein was served," as Paribas asserts, is inconsequential. Amoco asserted its set-off claim in June 1982, about one month before the complaint was filed. Paribas also claims, however, that Amoco was

made aware before June 1982 that Paribas had extended credit to Quasar and therefore that Paribas had a security interest in the proceeds of the May 1982 contract. To support this claim, Paribas offers an array of evidence: testimony that Paribas is the bank most active in extending such financing; evidence that Amoco knew or should have known that Quasar's net worth was far below the amounts involved in their contracts, and that Paribas was extending credit for Quasar's purchases from Amoco and from others to deliver to Amoco; the demand by Paribas, relayed to Amoco through Quasar, that Amoco agree to an "undertaking" to pay the money it owed for oil deliveries into Paribas before Paribas would lend Quasar the funds for its purchases; Amoco's agreement to what Amoco's own personnel referred to as an "undertaking" to pay into Paribas what Amoco owed Quasar for each of three consecutive deliveries; and the testimony of Quasar employee Ms. Farsun that in asking Amoco's Ms. David to modify the undertaking to provide specifically for payment to Paribas she told Ms. David this was necessary because "we had to open a letter of credit to our supplier based on the receivable from Paribas," Farsun Deposition 11–12. Paribas also offers the observation that Section 9–318 requires only that notification be received. *See* U.C.C. § 1–201(26). Thus, Paribas contends, even if the notice given by Quasar was somehow inadequate, the surrounding circumstances must have caused Amoco to have "received" notice, its knowledge being determined by all the facts and information available to it at the time in question. U.C.C. Section 1–201(25), (26).

Amoco responds with its own barrage of evidence and arguments. It stresses that Paribas claims neither to have taken steps of its own to notify Amoco directly of the assignment, nor to have required Quasar to inform Amoco specifically in writing or to have demanded that Quasar use terms such as "secured," "assigned," or "receivable" in its communications with Amoco. That Quasar in general needed funding conveys no notice of a specific assignment, Amoco contends, and conversations between Qua-

sar and Amoco before the Quasar-Paribas security agreement was executed on November 20, 1981, have no importance. More significantly, Amoco points to weaknesses in the deposition testimony of Quasar personnel, arguing that they had poor recall and were not believable. *See* Defendant's Reply Memorandum 22–25. Amoco's willingness to sign an "undertaking" to pay into Paribas also decreases in significance when placed in context. Amoco's agreement with Quasar, P/S 81–056X, expressly required payment "to Seller's bank upon presentation of seller's invoice and shipping documents," and Quasar's invoice for its May 1982 delivery required payment to Bankers Trust of New York "for the account of [Paribas], for further credit to Quasar Petroleum Ltd." Exhibit 26. Finally, Amoco relies on the fact that it promptly deleted from the original form of undertaking it sent to Paribas the language specifically requested by Paribas through Quasar, "without offset or counterclaim," and it claims thereby to have retained the right to protect itself against Quasar in related deals.

Paribas properly disparages the significance of Amoco's deletion of the words "without offset or counterclaim," at least in the context of a claimed notice of assignment under Section 9–318(3). Were the debtor permitted to undermine the workings of the statute, the utility of accounts-receivable financing would be adversely affected. If anything, Amoco's deletion of this phrase is some evidence that the company had notice that Quasar had transferred its interest in the account to Paribas, since Amoco would normally take this action only if it regarded Paribas as holder of the right to collect, not merely Quasar's banker.

Amoco's other evidence and arguments do, however, raise material issues of fact as to whether it received sufficient notice of Quasar's assignment to Paribas. Notice of an assignment need not take any special form. But the debtor must be made aware "that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which

does not reasonably identify the rights assigned is ineffective." U.C.C. § 9–318(3). In this case, Quasar made clear that payment was to be made to Paribas, and the rights at issue were identified; but Amoco disputes whether it was told that the rights had been "assigned," or in other words that payment was to be made to Paribas in Paribas' behalf. Cases which have held notice to have been "received" normally involve exposure of the account debtor to a document that, in one form or another, is a commercially recognizable assignment of a security interest. *E.g., Kaufman v. William Iselin & Co.*, 272 A.D. 578, 74 N.Y. S.2d 23, 26 (1st Dep't 1947) (invoice imprinted: "[t]his bill is assigned to and payable only to our factors"). Furthermore, the courts of states that have adopted Section 9–318(3) have not permitted general knowledge by the debtor that the creditor uses a bank for financing to constitute sufficient notice of an assignment of a particular contract. *Commercial Savings Bank v. G & J Wood Products Co.*, 46 Mich.App. 133, 207 N.W.2d 401 (1973); *S & W Trucks, Inc. v. Nelson Auction Service, Inc.*, 80 N.M. 423, 457 P.2d 220 (Ct.App.1969). Absent receipt by Amoco of a form reflecting a commercially recognizable assignment, and in the face of express, sworn, and tenable disavowals of notice by Amoco personnel, Paribas cannot establish its right to payment without some form of fact-finding hearing, even if further discovery were proper and permitted. The question, therefore, is whether the fact-finding hearing should take place in this court or before the arbitrator.

Had Paribas established without material, factual dispute that Amoco received notice of Quasar's assignment to Paribas before Amoco's claim against Quasar arose, Paribas could persuasively contend that its suit should be permitted to proceed unaffected by the arbitration agreement. Where the sole disputed issue is outside the properly limited scope of the assignee's involvement in the contract—*i.e.*, that of a secured creditor that has given proper notice of its refusal to be responsible for subsequent claims—the assignee should not be compelled to arbitrate such claims.

But here, where Paribas has not established beyond fair dispute that timely and sufficient notice was received by Amoco, such law as exists requires the factual dispute itself to be presented in arbitration. *In re James Talcott, Inc.*, 39 A.D.2d 846, 847, 333 N.Y.S.2d 1, 3 (1st Dep't 1972), *aff'd*, 33 N.Y.2d 924, 353 N.Y.S.2d 721, 309 N.E.2d 124 (1973) ("the question of fact as to whether the cross-claims accrued 'before the account debtor [received] notification of the assignment' (section 9–318, subd. (1)[b], Uniform Commercial Code) will be for the arbitrator to determine"). This result is also strongly suggested by federal arbitration principles generally, which leave to the arbitrator many issues that could conceivably result in findings that might ultimately make arbitration inappropriate. While it is true that, if proper notice was given in this case under Section 9–318, arbitration would be improper, it is equally true that, if proper notice was not given then Amoco's right to claim a set-off would not be cut off by Section 9–318, and that claim would only be properly heard in arbitration. Under these circumstances, given the preference for arbitration and the ease with which proper notice could have been established, arbitration is the proper forum for finding the threshold facts.

### IV. *Paribas' Claim as Beneficiary of a Separate Agreement.*

Paribas contends that, in addition to its rights as an assignee, it has a cause of action stemming from an agreement running directly between Paribas and Amoco, based on telexes evidencing Amoco's undertaking to pay Paribas for the oil Amoco received from Quasar. This alleged agreement contains no arbitration clause, so Paribas argues that this court must reach the merits.

Paribas claims the agreement may be found in the exchange of telexes and telephone calls between representatives of Quasar, Amoco and Paribas which took place around February 18 and 19, 1982. The following facts are undisputed. On February 18, Ms. Farsun of Quasar requested an "undertaking" from Ms. David

of Amoco for each month of supply. Ms. Farsun defined an undertaking as "Amoco saying that they are purchasing a certain quantity of certain crude oil from us and will pay us—will pay with Banque de Paris." Farsun Affidavit at 9. On February 18, Ms. David sent a telexed message "confirm[ing]" that Amoco would take delivery of a stated quantity of oil at a stated price and destination, payable "without offset or counterclaim." Exhibit 17. Mr. Hu of Paribas objected that this text did not specify that the money would be paid to Paribas. On the same day Ms. Farsun called Amoco and explained that "I needed [Amoco] to tell me that they will pay Quasar with the bank that we were dealing with." Farsun Affidavit at 11–12. Still on February 18, Ms. Farsun telexed Amoco a sample text garnered from its files of prior dealings with Paribas. Exhibit 16. Before adopting this text, Ms. David consulted with Amoco's legal department and with her superior. On February 19, 1982, Amoco dispatched the telex which thereafter became the operative document. It varied somewhat from the text requested by Paribas through Quasar, and completely deleted the phrase "without offset or counterclaim." *Compare id. with* Exhibit 18. The telex reads:

THIS TELEX REPLACES AMOCO OIL COMPANY'S TELEX OF FEBRUARY 18, 1982, TO YOU AND IT ALSO CONFIRMS THAT AMOCO OIL COMPANY WILL BE RECEIVING IN MARCH, 1982, FROM QUASAR PETROLEUM, LIMITED, 5,400 BARRELS PER DAY OF WEST TEXAS INTERMEDIATE CRUDE OIL BY IN–LINE TRANSFER IN ARCO PIPELINE AT CUSHING, OKLAHOMA, AT A UNIT PRICE OF U.S. DOLLARS 34.80 PER BARREL PAYABLE BY TELEGRAPHIC TRANSFER INTO BANQUE DE PARIS ET DES PAYS–BAS, NEW YORK, OF IMMEDIATELY AVAILABLE FUNDS UPON IMMEDIATE RECEIPT OF QUASAR'S COMMERCIAL INVOICE WITH SUCH PAYMENT INSTRUCTION AND PIPELINE DOCUMENTATION, BUT NOT LATER THAN THE TWENTIETH (20) OF THE MONTH FOLLOWING THE MONTH OF DELIVERY.

*Id.*

No matter how the language of this telex is characterized—as a "guarantee," an "undertaking," a promise to pay "into Paribas," or merely a "comfort letter" confirming the terms of the Quasar-Amoco contract—the agreement embodied in this telex could arguably be deemed inseparable from the contract, and its construction therefore a matter for the arbitrator. The telex recites the contract price and delivery terms and incorporates the payment instructions in Quasar's invoice. The invoice, dated April 13, 1982, is referenced PS 81–056X, and instructs Amoco to pay "to Bankers Trust Co., New York, N.Y., account # 04–202–195, Attention Mr. George Hu, for further credit to Quasar Petroleum Ltd., Bermuda, account No. 600502." Exhibit 20. To characterize this telex as separable from the underlying contract would allow Paribas to enforce its rights of payment under the contract without regard to the contract's remedial procedures, a result at odds with the objective of the Federal Arbitration Act "to relieve the parties from costly litigation and help ease congested court dockets. That purpose would be thwarted if plaintiffs [could] escape arbitration by fragmenting a single claim into two 'causes of action' predicated on different legal theories." *Tepper Realty Co. v. Mosaic Tile Co.,* 259 F.Supp. 688, 693 (S.D.N.Y.1966); *see also Coenen,* 453 F.2d at 1215–16.

As discussed above, however, this case seems distinguishable from those in which courts must compel arbitration without inquiry. Here, a third party that at no time expressly agreed to arbitrate is claiming that it formed a separate agreement with the account debtor, under which direct payment was promised for each delivery upon performance by the assignor of each delivery. The existence of such an agreement would establish that the assignee had implicitly refused to agree to arbitrate any of the disputes that it had expressly excluded as valid defenses, and the agreement would

thereby effectively limit the effect upon the assignee of the broad language of the arbitration clause in the underlying contract. Furthermore, since this allegation effectively puts "in issue" the "making of the arbitration agreement," a federal court must "proceed summarily to the trial thereof." 9 U.S.C. § 4.

Nevertheless, just as Section § 9–318(1)(b) requires the assignee to give clear notice of its status if it wishes to cut off future claims, the strictures of Section § 9–318 apply unless an account debtor has made "an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9–206." Paribas in effect contends that Amoco made such an agreement by promising in the "undertakings" to pay Paribas for the oil Amoco received from Quasar. Amoco has established without material dispute, however, that it never agreed it would "not assert against an assignee [Paribas] any claim or defense which [it] may have against the seller [Quasar]." U.C.C. § 9–206(1). After initially agreeing to pay into Paribas "without offset or counterclaim," and before Paribas extended financing, Amoco removed this language from its initial and all subsequent "undertakings." This action did not diminish Paribas' right to collect the sums due Quasar without regard to claims on other transactions if the claims arose after Amoco received notice of the assignment. The deletion by Amoco does establish, however, that it did not agree to waive any of its allowable claims under Section 9–318. Nothing presented by Paribas raises a disputed issue of material fact relating to Amoco's clear rejection of the proposed agreement that it not interpose any set-offs or counterclaims, so there is nothing summarily to try. *See* 9 U.S.C. § 4.

## V. *Conclusion*

■ Paribas argues that a ruling requiring it to arbitrate its dispute with Amoco would greatly harm the professed purpose of Section 9–318 to promote accounts-receivable financing. It contends that, once the assignor has completely performed its obligations under the contract to which the assigned right of payment pertains, the right to payment should become absolute, for it is the certainty of a right to payment after completion of performance that makes accounts-receivable financing attractive. Forcing an assignee to arbitrate, Paribas contends, would destroy this certainty and therefore frustrate the policy supporting this type of financing arrangement. Plaintiff's Brief at 42.

Forcing assignees of accounts to arbitration could well deter lenders from offering financing to support transactions which contain arbitration clauses, although one cannot know how substantially even a general policy of this sort would diminish so widespread a commercial practice. But the present case requires no such general rule to justify forcing Paribas to arbitrate. In this case, the arbitration agreement was part of a series of financial transactions, and on its face reserved to Amoco a right to arbitrate all related disputes. If parties such as Quasar could assign their rights to be paid sums due pursuant to such transactions, free of arbitration clauses that governed the collection of such sums by the assignor, then they could unilaterally confer on their assignees greater rights than the assignors possessed, and in the process deprive account debtors of the benefit of their bargained-for right to arbitrate, a right made "valid, irrevocable and enforceable" and given special protection by federal law. *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d at 409.

Furthermore, Paribas was well aware of the need to protect its right to collect sums due to Quasar, and could have insisted upon a financing arrangement that protected this right, even to the extent of depriving Amoco of any claim to arbitrate. For example, insisting that a letter of credit be opened in Quasar's favor on Part II of the contract would have insured payment in full on delivery of the title documents. Paribas instead accepted an "undertaking" to assure payment by Amoco, but with wording that left in doubt whether it intended to preclude Amoco from asserting the rights Amoco would otherwise have had against Quasar, or merely to assure that the money paid by Amoco went directly to Paribas rather than into Quasar's control. Paribas

was specifically alerted to the need for greater clarity when Amoco deleted the language "without offset or counter-claims" from its February 19 telex to Paribas, which indicated that Amoco meant to reserve its rights against Quasar in the event an arbitrable dispute arose. But Paribas did nothing further to protect its rights.

Paribas also failed to arrange for sufficient and timely notice to Amoco of the assignment from Quasar. For this reason alone, the bank cannot contend that a ruling against it in this case would have any significant bearing on accounts-receivable financing in general. An assignee relying upon the Uniform Commercial Code should be well aware that it can cut off the account debtor's subsequent claims, but only if the debtor is given sufficient, timely notice. U.C.C. § 9–318(1)(b). Paribas could readily have obviated any uncertainty on this score by sending Amoco a copy of its security agreement with Quasar, or by insisting that Quasar clearly and demonstrably inform Amoco of its existence, perhaps by way of notation on Quasar's invoices. Under these circumstances, to require Paribas to arbitrate merely reflects the accepted principle that, once an applicable agreement to arbitrate is established, the courts favor its enforcement. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974); *Conticommodity Services v. Philipp & Lion*, 613 F.2d 1222, 1224 (2d Cir. 1980).

Amoco's motion under section 3 of the Federal Arbitration Act for a stay pending arbitration is granted. The case will be closed pending the completion of arbitration, but either party may seek to reopen for any proper purpose, including enforcement of the arbitrator's decision.

SO ORDERED.