**UNITED STATES of America, Plaintiff,**

**v.**

**PANHANDLE EASTERN CORP., Panhandle Eastern Pipe Line Co., Trunkline Gas Co., Trunkline LNG Co., General Dynamics Corp., Moore McCormack Resources, Inc., Moore McCormack LNG Transport, Inc., Morgas, Inc., Pantheon, Inc., Pelmar Co., and Lachmar, a Delaware General Partnership, Defendants.**

**Civ. A. No. 87–190–JLL.**

United States District Court,
D. Delaware.

Oct. 27, 1987.

Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., Robert M. Hollis and Gregory A. Harrison, Civ. Div., Dept. of Justice, Washington, D.C. (Robert J. Patton, Jr., Maritime Admin., Washington, D.C., of counsel), for plaintiff.

Lawrence A. Hamermesh and Vicki Hagel, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Michael Joseph, Thomas M. Dyer, E. Alex Blanton, Marie Louise Hagen, and Brett M. Esber, of Dyer, Ellis, Joseph & Mills, Washington, D.C., of counsel), for defendants Panhandle Eastern Corp., Panhandle Eastern Pipe Line Co., Trunkline Gas Co., Trunkline LNG Co., Morgas, Inc., Pantheon, Inc., Pelmar Co., and Lachmar.

Richard A. Levine, of Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Richard T. Franch, Robert T. Markowitz, and Robert R. Stauffer, of Jenner & Block, Chicago, Ill., of counsel), for defendant Gen. Dynamics Corp.

Thomas Herlihy III, of Herlihy & Wier, Wilmington, Del. (Ralph J. Savarese, Michael J. Hurley, and Thomas Horton, of Howrey & Simon, Washington, D.C., of counsel), for defendants Moore McCormack Resources, Inc., and Moore McCormack LNG Transp., Inc.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I.  INTRODUCTION

This matter stems from a civil action brought by the United States of America, on behalf of the Maritime Administration ("Marad"), demanding monetary, declaratory and equitable relief from Panhandle Eastern Corporation ("PEC") and its various affiliates,[1] General Dynamics Corp. ("G.D."), Moore McCormack Resources, Inc. ("Moore McCormack"), and Moore McCormack LNG Transport, Inc. ("MMLT"). Essentially, this action seeks to protect the United States' security interests as the guarantor of ship financing bonds. Originally, Marad was the guarantor of $197.5 million of ship financing bonds issued pursuant to Title XI of the Merchant Marine Act of 1936, 46 U.S.C. §§ 1271–1280 (1982). Presently before the Court is PEC's Motion for Stay of Judicial Proceedings Pending Arbitration ("Motion to Stay") (Docket Item ["D.I."] 31, as amended by D.I. 46 at 1–2), pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1–14 (1982). Because the Court found no merit to PEC's argument in support of its Motion to Stay, its motion was denied by an Order dated October 19, 1987. (D.I. 64.)

---

1.  PEC has moved on behalf of itself and Panhandle Eastern Pipe Line Co. ("PEPL"), Trunkline Gas Co. ("Trunkline"), Trunkline LNG Co. ("TLC"), Morgas, Inc. ("Morgas"), Pantheon, Inc. ("Pantheon"), Pelmar Co. ("Pelmar"), and Lachmar ("Lachmar"). Each of these companies currently is a subsidiary of PEC, and any reference to "PEC" in this opinion includes all movants unless otherwise indicated.

This is the Court's opinion setting forth the reasons for the denial of that motion.

## II. BACKGROUND

### A. Facts Pertaining To This Motion

The facts pertinent to this motion are, for the most part, undisputed. In the early 1970's, PEPL and Trunkline initiated negotiations with Sonatrach, an Algerian national oil and gas company, to purchase liquefied natural gas ("LNG") for importation into the United States. In September, 1975, PEPL and Sonatrach entered into a contract for the sale and purchase of LNG ("Sonatrach Contract"). Four months later, PEPL then assigned its interest in the Sonatrach Contract to TLC, which at the time was an indirect, wholly-owned subsidiary of PEPL.

In 1976 PEPL, G.D., Moore McCormack, and MMLT (a Moore McCormack subsidiary) formed the wholly-owned subsidiaries, Pelmar, Pantheon and Morgas, respectively. In May, 1976, these subsidiaries entered into the Lachmar Partnership Agreement. (D.I. 1A, Exhibit A.) The Lachmar Partnership Agreement distributed the partnership assets of the newly formed Lachmar as follows: (1) Pelmar received a 40% share; (2) Pantheon received a 40% share; and (3) Morgas received a 20% share. (*Id.* at 3.)

At this time Lachmar and TLC entered into a Transportation Agreement ("Transportation Agreement"). (D.I. 1A, Exhibit B.) Under the terms of the Transportation Agreement, Lachmar agreed to provide two LNG tankers for the transport of LNG from Algeria to the United States. (*Id.*, Article II.) In return, TLC agreed to make specified minimum annual payments to Lachmar, whether or not the shipments were actually made.

Also at this time, Trunkline gave an assurance ("Trunkline Agreement") (D.I. 1A, Exhibit C), in which Trunkline agreed to "take whatever actions [were] necessary to enable [TLC], [Trunkline's] wholly-owned subsidiary, to perform all of its obligations under the Transportation Agreement, including the payment of all amounts due thereunder, . . . ." (*Id.* at 1.)

The cost to construct Lachmar's two LNG tankers was approximately $377.8 million. The construction costs were covered in large part by equity contributions from Lachmar's partners and by ship financing bonds issued by Lachmar, which were guaranteed by Marad pursuant to Title XI of the Merchant Marine Act of 1936, 46 U.S.C. §§ 1271–1280. In return for its guarantee of the ship financing bonds, Marad required Lachmar to enter into a Security Agreement ("Security Agreement"). (D.I. 1A, Exhibit D.) Under the terms of the Security Agreement, Marad took first and second mortgages on the two LNG tankers, as well as a security interest in Lachmar's "right, title and interest" in the Transportation Agreement between Lachmar and TLC, including all payments due thereunder. (*Id.* at 2, 3.) The Security Agreement also provided that Marad had no obligations under the Transportation Agreement. (*Id.* at 4.) Furthermore, TLC signed a consent to the assignment to Marad of Lachmar's rights under the Transportation Agreement. (D.I. 1A, Exhibit E.) Under its consent, TLC agreed that "[t]he Security Agreements [between Lachmar and Marad] do not impose on the Secretary any obligations or liabilities with respect to the Transportation Agreement." (*Id.* at 1, ¶ 3.) Trunkline similarly consented to the assignment to Marad of Lachmar's rights under the Trunkline Agreement. (*See* D.I. 1A, Exhibit F.)

The Lachmar tankers were eventually constructed and delivered to Lachmar in 1980. Pursuant to the terms of the Transportation Agreement and by agreement among the parties, performance of the Transportation Agreement was initiated on December 1, 1982.

By December, 1983, the Lachmar LNG tankers had completed several trips between Algeria and the United States, and Lachmar had submitted its first invoice to TLC under the Transportation Agreement. TLC and Trunkline then delivered three letters to Lachmar indicating that they were suspending their obligations under the Transportation Agreement, the Trunk-

line Agreement, and the Sonatrach Contract. (*See* D.I. 1A, Exhibits H, I, and J.) TLC claimed, among other things, that "adverse economic and market conditions ... [had] caused the purposes of [the various] agreements to be frustrated" and that "continued performance of such agreements [was] commercially senseless." (D.I. 1A, Exhibit H.)

Lachmar responded to this action by serving a demand for arbitration in New York, New York on TLC, Trunkline and PEC ("Lachmar Arbitration"). Sonatrach similarly initiated arbitration proceedings in Geneva, Switzerland, with PEC under the Sonatrach Contract.

In 1984, Lachmar initiated litigation in the United States District Court for the Southern District of New York to compel TLC to arbitrate. TLC argued that the arbitration could not proceed without joining Marad as a party. The district court ruled otherwise and held that Marad was not a necessary party to the arbitration. TLC appealed, and in *Lachmar v. Trunkline LNG Co.*, 753 F.2d 8 (2d Cir.1985), the Second Circuit Court of Appeals affirmed the district court's ruling.

The Lachmar Arbitration, in which Lachmar had demanded damages in excess of $860 million, was stayed temporarily to await an outcome in the Sonatrach/PEC arbitration. In June, 1985, counsel for PEC delivered to Marad the outline of a proposed settlement to the Lachmar Arbitration, under which PEC would buy out G.D.'s and Moore McCormack's partnership shares in Lachmar. Marad responded directly to TLC by letter in September, 1985, and informed it that the proposed sale could not occur without Marad's consent. (D.I. 1A, Exhibit K.) Marad also wrote a letter to Lachmar reaffirming its security interest in the Transportation Agreement, and its expectation that Lachmar would take steps to protect that security interest. (D.I. 1A, Exhibit L.) Finally, Marad wrote to Pelmar, Pantheon, and Morgas, and informed them that it could not "support the stock transaction as proposed unless all the parties [took] affirmative and effective steps to reduce the Government's risk." (D.I. 1A, Exhibit M.)

Nevertheless, on June 12, 1986, PEC, G.D., and Moore McCormack came to an agreement in principle on the purchase of Lachmar. (*See* D.I. 1A, Exhibit N.) On July 20, 1986, PEC purchased all the shares of stock of Pantheon from G.D. for $90 million, and all the shares of stock of Morgas from Moore McCormack and MMLT for $45 million. (*See* D.I. 1A, Exhibits P and Q.) Simultaneously, on July 20, 1986, Lachmar and TLC signed a stipulation dismissing the Lachmar Arbitration with prejudice. (D.I. 1A, Exhibit O.) The following day PEC issued a press release which, in part, proclaimed: "BUYOUT OF LACHMAR ENDS ARBITRATION." (D.I. 1A, Exhibit R at 1.)

In August, 1986, Marad responded to PEC's purchase of Lachmar and the concomitant dismissal of arbitration with a written protest to PEC, G.D., and Moore McCormack. (D.I. 1A, Exhibit S.) The next few months brought various discussions among Marad, PEC, Trunkline and TLC, apparently in an effort to secure a nonlitigated solution to Marad's claims that it had been damaged by the buy-out of Lachmar and the simultaneous dismissal of the Lachmar Arbitration. The most significant subsequent contact, however, occurred on March 10, 1987. On that date, the President of TLC delivered a letter to Marad indicating uncertainty as to how long TLC would arrange for funding to enable Lachmar to service its outstanding Title XI debt. (D.I. 1A, Exhibit U.) Within a month after the receipt of that letter, the United States brought this action against PEC and other named defendants from which the present Motion to Stay arises.

**B. The United States Arbitration Act**

PEC has moved to stay judicial proceedings pending arbitration pursuant to the United States Arbitration Act ("Act"), 9 U.S.C. §§ 1–14 (1982). The Act renders valid, irrevocable and enforceable in the courts any written agreement to arbitrate disputes concerning a commercial or maritime transaction. *Id.* § 2. Defendants'

present motion is predicated on section 3 of the Act, which provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (1982).

■ The Act's provisions evidence a federal policy that strongly favors arbitration agreements. *Shearson/American Express, Inc. v. McMahon,* — U.S. —, —, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The United States Supreme Court has noted that "[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate...." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985).

■ Notwithstanding the congressional mandate favoring strict enforcement of arbitration agreements, the Court may apply the Act's provisions only to those parties who are bound by the agreement to arbitrate. Thus it has been stated that "[a] court may not force a party to arbitrate when ordinary contract principles indicate that it has not agreed to do so." *Banque De Paris Et Des Pays–Bas v. Amoco Oil Co.,* 573 F.Supp. 1464, 1466 (S.D.N.Y.1983). In fact, the determinative question regarding defendants' motion is whether plaintiff was even a party to, and thus bound by, the arbitration agreement.

## III. ANALYSIS

■ In support of their motion to stay, defendants rely heavily upon *Banque De Paris Et Des Pays–Bas v. Amoco Oil Co.,* 573 F.Supp. 1464 (S.D.N.Y.1983) ("Paribas"). In *Paribas,* the court stayed judicial proceedings and bound an assignee of a security interest in receivables to arbitration provisions in the underlying contract. In particular, defendants point to the following language in the opinion:

> The Uniform Commercial Code differentiates between a "normal commercial assignment, which substitutes the assignee for the assignor both as to rights and duties, and a financing assignment in which only the assignor's rights are transferred." U.C.C. § 2–210(4) & Official Comment 5. The UCC makes explicit, however, that "the rights of an assignee are subject to ... all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom." U.C.C. § 9–318(1)(a). This principle applies to arbitration provisions, which would be of no value if a party "could escape the effect of such a clause by assigning a claim subject to arbitration between the original parties to a third party." *Hosiery Manufacturers' Corp. v. Goldston,* 238 N.Y. 22, 28, 143 N.E. 779, 780 (1924). Even an assignment only of contract "rights" not entailing any duty of performance, *see* U.C.C. § 2–210, Official Comment 5, must be deemed to include the bargained-for remedial procedure. *See* U.C.C. § 1–201(36) (defining "rights" to include "remedies").... At least one lower court has squarely held that a lender who takes an assignment of accounts receivable as security for a loan is required to follow the remedial procedure specified in the assigned contract. *Cutting Room Appliances Corp. v. National Bronx Bank,* 97 N.Y.S.2d 363 (Sup.Ct.Bronx Cty.1950).

573 F.Supp. at 1469–70.

While this portion of the opinion at first appears controlling in the instant case, defendants conveniently fail to place it in

proper context by ignoring the language that begins the opinion:

> Whether the assignee has obligated itself to arbitrate this dispute turns upon the reach of the assignee's contractual obligations. Normally, the assignee is bound to arbitrate all disputes, if that is the remedial mechanism agreed upon by the assignor. *Nevertheless, ... the assignee, of a security interest may be able to establish that it has refused to agree to arbitrate subsequent claims by giving proper notice of the limited nature of its involvement, or by obtaining a separate and legally sufficient agreement with the account debtor that the debtor will pay without asserting offsets or counterclaims.* But the assignee in this case cannot establish that it gave proper notice or secured the necessary agreement, so it cannot avoid the normal contract rule requiring arbitration. The action must therefore be stayed pending arbitration.

*Id.* at 1466 (emphasis supplied).

In *Paribas,* therefore, the court reached its holding because the assignee failed to secure any agreement concerning the scope of its involvement in the underlying contract. In the instant case, however, Marad left no stone unturned to ensure that it would have no obligations under the Transportation Agreement. First, in its security agreement with Lachmar, Marad included the following provision: "The Secretary shall not, by virtue of this Security Agreement, have any obligations under ... the Transportation Agreement." (D.I. 1A, Exhibit D at 4.) Second, and more significantly, the consent agreement signed by TLC clearly provided that "[t]he Security Agreements do not impose on the Secretary any obligations or liabilities with respect to the Transportation Agreement." (D.I. 1A, Exhibit E at 1.) Consequently, the *Paribas* case, in which no such agreements were entered into, is inapposite to the case at hand.

Nevertheless, defendants argue further that TLC's consent agreement should not be read as an agreement that Marad bore no duty to arbitrate in the event that Mar-

ad itself affirmatively sought to enforce the Transportation Agreement. Rather, argue defendants, the consent merely recognized that Lachmar was assigning to Marad only the "rights" under the Transportation Agreement, and none of the "obligations." Defendants contend that an affirmative enforcement of those rights requires compliance with the remedial measures stipulated in the underlying contract. The Court finds no merit to this argument under the facts of this case. The obligation to arbitrate disputes under the Transportation Agreement is one of the obligations from which Marad protected itself.

This Court does not stand alone in that assessment. Significantly, the same position was taken by the United States Court of Appeals for the Second Circuit in *Lachmar v. Trunkline LNG Company,* 753 F.2d 8 (2d Cir.1985). In *Lachmar,* the Second Circuit held that "Marad was neither a necessary nor indispensable party to the arbitration" between Lachmar and TLC. *Id.* at 10. In so holding, the court stated in no uncertain terms that "Marad did not assume Lachmar's duty to arbitrate." *Id.* In its succinct opinion, the *Lachmar* court based its conclusion on two factors. First, the court noted that both the Security Agreement between Lachmar and Marad, and the Consent Agreement between Marad and TLC provided that Marad incurred no obligations under the Transportation Agreement. *Id.* at 9. Second, the court explained that 46 U.S.C. § 1275(e) provided the Government, as guarantor in a Title XI financing arrangement, with an independent statutory right of action against an obligor or any other liable party in order to protect the Government's security interest. 753 F.2d at 10.

> Section 1275(e) provides in pertinent part:
>
> In the event of a default under any guaranteed obligation *or any related agreement,* the Secretary shall take such action against the obligor or any other parties liable thereunder that, in his discretion, may be required to protect the interests of the United States. Any suit may be brought in the name of the United States or in the name of the obligee

 

and the obligee shall make available to the United States all records and evidence necesary to prosecute any such suit.

46 U.S.C. § 1275(e) (Supp.1985) (emphasis supplied). It is apparent, therefore, that the *Lachmar* court had no difficulty in determining that Marad had no obligation to arbitrate.

Notwithstanding the Second Circuit's position, defendants attempt to argue that the *Lachmar* court merely addressed the issue whether Marad was a necessary and indispensable party to the Lachmar/TLC arbitration. Defendants thereby contend that the *Lachmar* decision is not pertinent to the present action, where Marad itself is a party and is affirmatively asserting its own rights. The Court finds this to be tantamount to a frivolous argument. As a legal predicate to its ultimate holding that Marad was not a necessary party to the Lachmar/TLC arbitration, the *Lachmar* court found that "Marad did not assume Lachmar's duty to arbitrate." 753 F.2d at 10. The Court finds it difficult to imagine a clearer resolution of that issue.

Both plaintiff and defendants have proffered a variety of other arguments with respect to defendants' Motion to Stay. Because the Court finds the foregoing analysis sufficient basis to deny defendants' motion, those remaining arguments need not be addressed.

## IV. CONCLUSION

Defendants' Motion to Stay is predicated on the United States Arbitration Act, 9 U.S.C. §§ 1–14 (1982), and the arbitration clause in TLC's Transportation Agreement with Lachmar. The Court has found and concluded that Marad has no obligation to arbitrate under that agreement, and, therefore, defendants' Motion to Stay has been denied. Marad did not directly assume a duty to arbitrate under the Transportation Agreement because it was not a party to that agreement. Furthermore, Marad did not indirectly assume such a duty as security assignee, because it entered into agreements which expressly absolved it from any such obligation. This conclusion is

also supported by the Second Circuit's decision in *Lachmar v. Trunkline LNG Co.*, 753 F.2d 8 (2d Cir.1985), which is conclusive as to this issue.