### GMAC COMMERCIAL CREDIT LLC, Plaintiff,

v.

### SPRINGS INDUSTRIES, INC., Defendant.

### No. 00 Civ. 2893(NRB).

United States District Court, S.D. New York.

April 25, 2001.

---

4. Many, if not all, of the state law claims, for example, are time-barred.

John P. Amato, Hahn & Hessen, L.L.P., New York City, for plaintiff.

Arthur S. Greenspan, Lee S. Richards, Richards, Spears, Kibbe & Orbe, New York City, for defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff GMAC Commercial Credit, LLC ("plaintiff" or "GMAC") filed suit against Springs Industries, Inc. ("defendant" or "Springs") in the Supreme Court of the State of New York, County of New York, on April 3, 2000, to recover moneys allegedly owed it on several unpaid invoices. Defendant removed the action to this Court on April 14, 2000, pursuant to 28 U.S.C. §§ 1441 and 1446. Defendant now moves pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA") and Fed. R.P. 12(b)(1) and 12(b)(6) to stay or dismiss the action and to compel arbitration. For the following reasons, defendant's motion is granted, the complaint is dismissed and the parties are ordered to proceed to arbitration in Charlotte, North Carolina under the terms of the arbitration agreement.

## *BACKGROUND* [1]

Springs, a textile manufacturer and wholesaler, placed a series of six orders with Rugmakers, Inc. ("Rugmakers") for rug sets between December 1997 and Feb-

---

1. Unless otherwise indicated, all facts and allegations concerning this case are taken from the Parties' respective pleadings, affida- vits and attached documents. The facts material to this ruling are undisputed.

ruary 1998. We will use the same designations for the orders that the parties did in their papers.

Springs' relationship with Rugmakers began with its "Initial Purchase Order", dated December 19, 1997. Attached to the Initial Purchase Order and incorporated therein was a lengthy "Standard Terms and Conditions of Purchase" prepared by Springs. The "Standard Terms" included an arbitration provision that stated,

> *"Arbitration:* Seller agrees to submit any disputes arising under this Order to binding arbitration in accordance with the rules of the American Arbitration Association. Seller and Springs agree that any arbitration shall be held in the city of Charlotte, North Carolina."

Emerson Aff. Ex. A, Standard Terms and Conditions of Purchase, ¶ 16. Springs placed a second purchase order (referred to in the Complaint as "Purchase Order No. 1") on January 16, 1998. Purchase Order No. 1 explicitly incorporated the same Standard Terms and Conditions of Purchase sheet that was incorporated into the Initial Purchase Order.

The remaining four purchase orders (referred to in the Complaint as "Purchase Orders No. 2, 3, 4, and 5"), were short-form computer-generated and computer-transmitted orders. The front of each short-form order bore the caption: "WE HEREBY ORDER THE MERCHANDISE SPECIFIED HEREIN ON ALL THE TERMS SET FORTH ON THE FACE AND REVERSE SIDES HEREOF, INCLUDING ARBITRATION." Geren Aff. Exs. D, E & F. Springs concedes, for the purposes of this motion, that the backs of the short-form orders were never transmitted.

Prior to any of the purchase orders with Springs, GMAC and Rugmakers entered into a November 8, 1996, Revolving Credit, Term Loan and Security Agreement pursuant to which, *inter alia,* Rugmakers granted GMAC a security interest in all of its present and future accounts receivable and assigned to GMAC all accounts receivable generated by Rugmakers at any time. The relevant terms of the assignment were as follows:

> "[GMAC] shall not, whether by anything herein or in any assignment or otherwise, assume any of [Rugmaker's] obligations under any contract or agreement assigned to [GMAC], and [GMAC] shall not be responsible in any way for the performance by [Rugmakers] of any of the terms and conditions thereof."

Murray Aff., Ex. A, ¶ 4.18. GMAC duly perfected its security interest by filing U.C.C.–1 financing statements with the appropriate authorities. However, neither GMAC nor Rugmakers obtained Springs' consent to the assignment or gave Springs notice thereof.

GMAC has brought this suit against Springs, based on the contracts assigned it by Rugmakers, seeking recovery of unpaid sums on Purchase Orders No. 1–5. Springs contends that GMAC is contractually bound to arbitrate its claims in Charlotte, North Carolina and moves to compel arbitration.

### DISCUSSION

I. *A finance assignee suing on an assigned contract is subject to the contract's arbitration clause.*

█ The first issue is whether GMAC is exempt from any contractual arbitration provisions by virtue of the fact that it allegedly was a "finance assignee" (or "factor"), assigned Rugmakers' rights, but not obligations, under the orders.

█ The FAA governs this issue because the controversy involves interstate commerce. *See Moses H. Cone Memorial*

*Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 510 (3d Cir.1990). "In enacting [the FAA], Congress declared a strong national policy favoring arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Accordingly, the Supreme Court has found that "the [FAA] establishes that, as a matter of [F]ederal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Memorial Hospital,* 460 U.S. at 24–25, 103 S.Ct. 927. However, notwithstanding this policy favoring arbitration, "arbitration is [still] a matter of contract and a party cannot be required to submit to arbitration [in] any dispute which he has not agreed so to submit." *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Therefore, "[b]efore compelling an unwilling party to arbitrate, [the FAA] requires the court to engage in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement...." *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 511. In this limited review, we look to state contract law to determine the scope and meaning of an arbitration clause, *see Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 45–46 (2d Cir.1993) ("[W]e apply state law in determining whether the parties have agreed to arbitrate."), while remaining mindful of the FAA's overriding preference for arbitration. *See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 475, 109 S.Ct. 1248, 103 L.Ed.2d 488 ("[I]n applying general state-law principles of contract in-

terpretation to the interpretation of an arbitration agreement within the scope of the [FAA], due regard must be given to the [f]ederal policy favoring arbitration...." (citation omitted)).

GMAC points to a line of New York cases dating back to the first half of the century to support its proposition that a finance assignee is not obligated to arbitrate under the contract assigned, unless he has undertaken this obligation. This line of cases is based on two common law principles: (1) a finance assignee is assigned rights, but not obligations, under the contract; and (2) arbitration is a contractual obligation. *See, e.g., United States v. Panhandle Eastern Corp., et al.,* 672 F.Supp. 149 (D.Del.1987); *Rosenthal & Rosenthal, Inc. v. John Kunstadt, Inc.,* 106 A.D.2d 277, 482 N.Y.S.2d 287 (App. Div. 1st Dep't 1984); *Kaufman v. William Iselin & Co., Inc.,* 272 A.D. 578, 74 N.Y.S.2d 23 (App.Div. 1st Dep't 1947); *see also Gruntal & Co., Inc. v. Ronald Steinberg, et al.,* 854 F.Supp. 324 (D.N.J.1994) (applying New York law and citing New York holdings). Plaintiffs include in this line *Lachmar v. Trunkline LNG Co.,* 753 F.2d 8 (2d Cir.1985), a two-page *per curiam* Second Circuit opinion that held that the Maritime Administration ("Marad") (a federal entity) was not bound to appear at an arbitration between two other parties to a contract in which it had a security interest.

However, GMAC's reliance on this line of cases is misplaced. The New York common law principle that arbitration was an "obligation" not assumed by a finance assignee was superseded by New York's adoption of the Uniform Commercial Code (or "U.C.C.") provision 9–318(1) in 1964. That provision states, in relevant part, that:

"(1) *Unless an account debtor has made an enforceable agreement not to assert*

*defenses or claims* arising out of a sale as provided in Section 9–206 the rights of an assignee are subject to

- (a) *all the terms of the contract* between the account debtor and assignor and any defense or claim arising therefrom ..."

This principle is essentially an application of the "elementary ancient law that an assignee never stands in any better position than his assignor. An assignee is subject to all the equities and burdens which attach to the property assigned because he receives no more ... than his assignor." *Septembertide Publishing, B.V. v. Stein and Day, Inc.* 884 F.2d 675, 682 (2d Cir.1989) (citation omitted).

As plaintiff rightly points out, the U.C.C. does distinguish finance assignments from general assignments. It recognizes that general assignments confer both the assignor's rights and obligations to the assignee whereas a finance assignment confers only the assignor's rights.[2] Insofar as "obligations" refers to performance obligations, this rule is eminently sensible. Few finance assignments would ever occur if an assignee creditor could be held liable for the assignor's breach of the underlying contract. However, in interpreting U.C.C. 9–318(1), courts have held that arbitration is a contractual *remedy*, not an *obligation*, and cannot be abrogated through a finance assignment.[3] *See Banque De Paris et des Pays–Bas v. Amoco Oil Co.*, 573 F.Supp. 1464, 1469–70 (S.D.N.Y.1983) (Sofaer, J.); *Cone Constructors, Inc. v. Drummond Community Bank*, 754 So.2d 779 (Fla.App. 1st Dist. 2000) (applying U.C.C. § 9–318). The adoption of the Article 9 of the U.C.C. means that a finance assignee suing on an assigned contract is bound by that contract's arbitration clause unless it secured a waiver from the signatory seeking to arbitrate. *See Pays–Bas*, 573 F.Supp. at 1470–71.

■ Neither GMAC nor Rugmakers secured such a release from Springs. Fur-

---

2. *See* U.C.C. § 2–210(4) and Official Comment 5:

"(4) An assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of rights and *unless the language or the circumstances (as in an assignment for security) indicate the contrary,* it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract ...
[Official Comment Number] 5. Subsection (4) lays down a general rule of construction distinguishing between a normal commercial assignment, which substitutes the assignee for the assignor both as to rights and duties, *and a financing assignment in which only the assignor's rights are transferred."* (emphasis added)

3. As Judge Sofaer explained in *Pays–Bas,* "case law supports the basic principle that an assignee or other party whose rights are premised on a contract is bound by the remedial provisions bargained for between the original parties to the contract. Courts in this circuit have held, for example, that a mortgagee seeking to enforce its rights under the mortgagor's insurance contract is bound by the arbitration clause, *Wells Fargo Bank International Corp. v. London Steam-Ship Owners' Mutual Insurance Association,* 408 F.Supp. 626, 629 (S.D.N.Y.1976); that the assignee of a non-negotiable note given in payment of a contract obligation containing an arbitration clause may be obligated to arbitrate, *Netherlands Curacao Co., N.V. v. Kenton Corp.,* 366 F.Supp. 744, 746 & n. 3 (S.D.N.Y.1973); that an assignee of a contract containing an arbitration provision may become party to the provision, *Fisser v. International Bank,* 282 F.2d 231, 233–35 & n. 6 (2d Cir.1960); and recently that 'an assignee of a claim takes it with whatever limitations it had in the hands of the assignor,' *Caribbean Steamship Co. v. Sonmez Denizcilik Ve Ticaret, A.S.,* 598 F.2d 1264, 1266–67 (2d Cir.1979)." *Pays–Bas*, 573 F.Supp. at 1469.

thermore, we reject plaintiff's urging that we infer notice or implied consent from the fact that Springs could have searched for GMAC's U.C.C.–1 filings and learned of its security interest. Under New York law, a party receives notification when it receives actual notice of the assignment. *See Baii Banking Corp. v. UPG, Inc.*, No. 86 Civ. 5544, 1991 WL 33421 (S.D.N.Y.1991); U.C.C. § 1–201(26) ("A person 'receives' a notice or notification when (a) it comes to his attention; or (b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications."). Here, there is no indication that Springs actually knew of Rugmakers' assignment prior to submitting its order or that GMAC duly delivered notice to Springs. Moreover, under U.C.C. § 9–318(1)(b), notice of an assignment only frees the assignee from defenses arising *outside* the contract. *See* U.C.C. § 9–318(1)(b) (an account debtor may assert against an assignee, in addition to any claims or defenses arising from the underlying contract, "any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment."); *Pays–Bas* 573 F.Supp. at 1470–71. Plaintiff's claims in this action arose *from* the contract so notice alone would have been insufficient. Finally, as a matter of policy, it would be illogical to shift the burden of notice from the parties to the assignment, who necessarily are aware of the action, to the unknowing account debtor. If Springs had affirmatively consented to GMAC's assignment of Rugmakers' rights free from arbitration, then GMAC could assert that Springs had waived arbitration. However, given the established law requiring actual notice of affirmative consent, we will not infer Springs' consent from the fact that GMAC's U.C.C.–1 filings were publicly available.

The cases cited by plaintiff as contrary to this principle are either distinguishable or erroneous. We begin with the Second Circuit's *Lachmar* opinion which, properly understood, is consistent with our analysis. In *Lachmar*, defendants Trunkline LNG Company ("TLC") and Trunkline Gas Company ("TGC") sought to stay Lachmar's demand for arbitration on the ground that Marad, a guarantor for Lachmar on the disputed contract, was not joined as a party. The Second Circuit ruled that Marad, to whom Lachmar assigned certain payments under the contract, was not bound to appear at the arbitration because "Marad did not assume Lachmar's duty to arbitrate." *Lachmar*, 753 F.2d at 10. However, *Lachmar* is inapposite to the case at bar in several important respects.

First, Marad neither sought nor was implicated in the relief at issue in the arbitration, whereas assignee GMAC brings suit herein. The Second Circuit cited only one case, *Kaufman*, 272 A.D. 578, 74 N.Y.S.2d 23 (App.Div. 1st Dep't 1947), for the proposition that Marad, as a finance assignee, was not bound by an assigned arbitration clause. However, as Judge Motley recently pointed out in *GMAC v. Dillard Department Stores, Inc.*, 198 F.R.D. 402, 407–8 (S.D.N.Y. Jan.17, 2001), *Kaufman* turned on the fact that the defendant assignee had *not sought* to enforce his rights under the contract. Indeed, the *Kaufman* court stated that, in contrast, a finance assignee who sought to enforce contract rights *would* be bound by that contract's arbitration provision. *See Kaufman*, 74 N.Y.S.2d at 26.[4] Thus,

---

4. Specifically, *Kaufman* held, "We limit our decision to holding that on the present record

no case is made out to justify a finding that the factor, under the conditions herein pre-

*Lachmar's* analysis and its facts are limited to cases where factors are "passive", i.e. sued or joined as a third-party.

■■■ *Kaufman's* distinction between situations where factors sue upon a contract and those where they are sued is a sensible one in determining whether arbitration is an "obligation" or a "remedy." The U.C.C. explicitly states that a contract's remedial measures are part and parcel of the rights the contract confers. *See* U.C.C. § 1–201(36) (definition of " 'Rights' includes remedies."); U.C.C. § 1–201(34) (definition of " 'Remedy' means any remedial right to which an aggrieved party is entitled with or without resort to a tribunal."); *Pays–Bas,* 573 F.Supp. at 1470 ("Even an assignment of only contract 'rights' not entailing any duty of performance [citation omitted] must be deemed to include the bargained-for remedial procedure."). Therefore, where a factor chooses to sue upon a contract with an arbitration clause, *arbitration is part of the contractual right the plaintiff factor exercises.* Plainly, an assignment cannot alter a contract's bargained-for remedial measures, for then the assignment would change the very nature of the rights assigned. *See Septembertide Publishing,* 884 F.2d at 682 (*quoting International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.,* 36 N.Y.2d 121, 126, 365 N.Y.S.2d 808, 325 N.E.2d 137 (1975)); *Caribbean Steamship Co., S.A. v. Sonmez Denizcilik Ve Ticaret A.S.,* 598 F.2d 1264, 1266–67 (2d Cir.1979); *Pays–Bas,* 573 F.Supp. at 1470 ("arbitration provisions, [ ] would be of no value if a party 'could escape the effect of such a clause by assigning a claim subject to arbitration between the original parties to a third par-

ty.' " *Manufacturers' Corp. v. Goldston,* 238 N.Y. 22, 28, 143 N.E. 779 (1924)); *see also GMAC v. Dillard,* 198 F.R.D. at 407 ("If the law embodied by U.C.C. § 9–318(1)(a) did not apply to forum selection clauses, then the clauses would serve little purpose, because 'a party could escape the effect of a forum selection clause by assigning or subrogating its rights.' " *Farrell Lines Inc. v. Columbus Cello–Poly Corp.,* 32 F.Supp.2d 118, 126 (S.D.N.Y. 1997)).

■■■ In contrast, when a factor is sued on an assigned contract, as in *Kaufman,* it has not sought to invoke its rights with their inherent remedial features. Any duty to arbitrate would lie wholly apart from the factor's assigned rights and, therefore, would constitute an assigned obligation. Thus, to the extent a factor receives valid assignment of rights free from "obligations," it cannot be forced to arbitrate defensively. In the instant action, unlike *Lachmar* or *Kaufman,* GMAC brings suit on the contracts and, therefore, cannot escape their arbitration clauses.

■■■ There is a second separate reason that Marad could not be compelled to arbitrate—namely, that Marad, through the Secretary of State, has a statutory right to "take such action against the obligor or any other parties liable thereunder that, in [the Commerce Secretary's] discretion, may be required to protect the interests of the United States." 46 U.S.C. § 1275(e). This congressionally conferred right of action cannot be abrogated by an arbitration clause in an assigned contract and the Second Circuit relied upon this in deciding *Lachmar. See Lachmar,* 753 F.2d at 10. In contrast, GMAC enjoys no such statutory right to litigate.

---

sented, has assumed the duty to arbitrate. *This is not a situation where the assignee has taken any affirmative action under the contract to enforce its terms; in such event it is proper*

*to hold that having taken steps to adopt the terms of the contract he had assumed the obligations as well as the rights thereunder." Id.* at 26 (emphasis added).

Third, the Second Circuit emphasized that "TLC [the defendant in *Lachmar* that sought to compel Marad to appear at arbitration] consented to the assignments in a written agreement." *Id.* at 9. Specifically, the agreement provided that "[t]he Security Agreements do not impose on the Secretary [of Commerce] any obligations or liabilities with respect to the Transportation Agreement." *Id.* This written consent constituted the release from arbitration contemplated in *Pays–Bas* and *Lachmar.* In the instant case, Springs did not consent to Rugmakers' finance assignment to GMAC, free from "obligations."

And fourth, *Lachmar* cannot be construed as interpreting U.C.C. § 9–318 because Article 9 does not apply to security interests subject to a statute of the United States. *See* U.C.C. § 9–104.

Thus, *Lachmar* is inapposite and does not control because (1) GMAC is a factor suing on the contract, (2) GMAC has no independent statutory right of action, (3) GMAC did not obtain Springs' agreement to a finance assignment free from the arbitration requirement, and (4) *Lachmar* does not address U.C.C. § 9–318, the rule at issue.

Plaintiff points chiefly to two other cases in support of the proposition that a finance assignee is not bound by an assigned contract's arbitration provision. First, plaintiff argues that in *Rosenthal,* 106 A.D.2d 277, 482 N.Y.S.2d 287 (1st Dept.App.Div. 1984), a post-U.C.C. case, the First Department, Appellate Division, held that a factor suing upon a contract containing an arbitration clause was not bound by that clause. Although plaintiff correctly states *Rosenthal's* holding, we are of the view that the *Rosenthal* court misinterpreted the plain language of *Kaufman,* the decision it cited as controlling. As Judge Motley explained in *GMAC v. Dillard,* 198 F.R.D. at 407–8, *Rosenthal* ignored *Kauf-*

*man's* language limiting its holding to cases in which factors are passive parties and stating the court's belief that factors suing upon an assigned contract assume that contract's arbitration provision. In the absence of any explanation in *Rosenthal* of why it departed from *Kaufman's* plain language, we concur that *Rosenthal* misstated New York law and thus does not have precedential weight.

Plaintiff also looks to *United States v. Panhandle Eastern Corp., et al.,* 672 F.Supp. 149 (D.Del.1987), a later case in the dispute between Lachmar, TLC, TGC and Marad. In *Panhandle,* Marad sued several defendants, including Lachmar, TLC and TGC, seeking to protect its security interests in light of a proposed settlement of disputes between the defendants. The court ruled that Marad was not bound by the arbitration clause and could proceed in court against the defendants. *Panhandle* rested its holding on two grounds: (1) that TLC (a defendant seeking to compel arbitration) contemporaneously consented in writing to Marad's financial assignment free from "obligations," and (2) its erroneous conclusion that arbitration is an "obligation."

Essentially, *Panhandle* is in full agreement with *Pays–Bas* that a finance assignee cannot escape an arbitration provision in an assigned contract without the debtor's consent; the cases simply differ on their facts. *Panhandle* began by acknowledging that *Pays–Bas'* holding that finance assignees are subject to assigned contracts' arbitration clauses "at first appears controlling in the instant case." *Id.* at 153. It distinguished its outcome from *Pays–Bas'* only on the factual basis that,

"the [*Pays–Bas* ] court reached its holding *because the assignee failed to secure any agreement concerning the scope of its involvement in the underlying contract.* In the instant case, however,

Marad left no stone unturned to ensure that it would have no obligations under the Transportation Agreement. First, in its security agreement with Lachmar, Marad included the following provision: 'The Secretary shall not, by virtue of this Security Agreement have any obligations under ... the Transportation Agreement.' [citation omitted]. *Second, and more significantly, the consent agreement signed by TLC clearly provided that '[t]he Security Agreements do not impose on the Secretary any obligations or liabilities with respect to the Transportation Agreement.'* [citation omitted]. Consequently, the Paribas case, in which no such agreements were entered into, is inapposite to the case at hand." *Id.* at 154.

The facts before us are similar to *Pays–Bas,* not *Panhandle.* GMAC neither solicited nor secured Springs' consent for GMAC to take assignment of Rugmakers' contract claims free from the requirement to arbitrate. Therefore, *Panhandle's* holding actually supports the conclusion that GMAC took assignment subject to the contracts' arbitration clauses because GMAC, unlike Marad, failed to obtain the account debtor's consent to take assignment free from arbitration.

*Panhandle's* analysis also rested on its erroneous conclusion that "[t]he obligation to arbitrate disputes under the Transportation Agreement is one of the *obligations* from which Marad protected itself." *Id.* (emphasis added). Significantly, although *Panhandle* simply dismissed as "frivolous" defendants' contention that arbitration was a "remedial measure[ ]," not an obligation, *id.* at 155, it offered no independent analysis for this rejection. It simply cited

*Lachmar* for the proposition that arbitration is an obligation, not a remedy. As previously discussed, however, we find that *Lachmar's* holding is limited to those instances where, unlike here, the assignee is a passive defendant or third party.

Finally, as a matter of policy, it is appropriate to place the burden of negotiating out of arbitration clauses on factors. As lenders, factors have bargaining power over borrowers. If they are averse to arbitration, factors can contract with their borrowers to prevent them from entering trade agreements with arbitration clauses.[5] It is particularly appropriate to place this burden on factors where, as here, they are on notice that arbitration is the dispute resolution mechanism used overwhelmingly in the industry. *See Chelsea Square Textiles, Inc. v. Bombay Dyeing & Manufacturing Co., Ltd.,* 189 F.3d, 289, 290–91, 296–97 (2d Cir.1999) (participants in the textile industry "generally [are] on notice that an agreement to purchase textiles is not only likely, but almost certain, to contain a provision mandating arbitration in the event of disputes, and must object to such a provision if it seeks to avoid arbitration."). Moreover, if we placed the burden of ensuring arbitration clauses' efficacy on textile trade buyers, as plaintiff urges, these buyers would be forced to negotiate all trade agreements with not only sellers, but also those sellers' factors. For without the factors' contractual consent to arbitration, no textile party could ever be confident that his right to arbitration would not be unilaterally eviscerated by a finance assignment. Such an arrangement would certainly be no more desirable than the current practice.

---

**5.** Although plaintiff protests that factors would have no effective remedy if a debtor breached such an agreement (i.e., they could not sue to have the contract rescinded), this concern is not dispositive. Factors can create liquidated damages provisions that would provide sufficient relief to discourage and compensate for breaches and can choose not to lend to parties with histories of breaching.

Thus, based on the U.C.C., caselaw and policy considerations, we find that GMAC is not released from the arbitration provision at issue in this suit by virtue of the fact that it was a finance assignee. Accordingly, we turn to the question of which of Springs' orders, if any, were subject to arbitration clauses.

II. *All six of Springs' order are governed by the arbitration clause in Springs' "Standard Terms and Conditions of Purchase."*

■ GMAC does not contest that the Initial Purchase Order and Purchase Order No. 1 are governed by the arbitration provision in the "Standard Terms and Conditions of Purchase." As recited earlier, that provision stated:

"*Arbitration.* Seller agrees to submit any disputes arising under this Order to binding arbitration in accordance with the rules of the American Arbitration Association. Seller and Springs agree that any arbitration shall be held in the city of Charlotte, North Carolina."

Emerson Aff., Ex. A, Standard Terms and Conditions of Purchase, ¶ 16. The issue, therefore, is whether these terms were incorporated into Purchase Orders No. 2–5. Purchase Orders No. 2–5 were made via a short-form electronic order. As earlier stated, each contained the following provision:

"WE HEREBY ORDER THE MERCHANDISE SPECIFIED HEREIN ON ALL THE TERMS SET FORTH ON THE FACE AND REVERSE SIDES HEREOF, INCLUDING ARBITRATION."

Springs concedes, for the purposes of this motion, that the backs of the orders were never transmitted.

It is a basic canon of contract construction that "[a] course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement." U.C.C. § 1–205(3). Moreover, the Second Circuit has held, in particular, that course of dealing and trade usage can support the application of an arbitration clause. *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 25 (2d Cir.1995). In light of the following, we find that Springs' first two orders established a course of dealing that, considered in the context of the textile trade and in light of the short-form orders' language, made Purchase Orders No. 2–5 subject to the "Standard Terms" arbitration clause.

First, the fact that the arbitration clause was contained in a document entitled "*Standard Terms* and Conditions of Purchase" (emphasis added) put Rugmakers on notice that the "Standard Terms" of the parties' dealings would include this arbitration provision. Had the arbitration clause been unique to the first two orders, it presumably would have appeared on the faces of those orders, not on an incorporated sheet of "Standard Terms."

Second, the electronic orders explicitly stated that they were subject to accompanying contract terms "INCLUDING ARBITRATION." Although the accompanying terms were omitted from the electronic orders, it was nevertheless plain to Rugmakers that the orders were subject to arbitration. In light of the fact that the first two orders were clearly governed by a "Standard Terms" arbitration clause, Rugmakers cannot reasonably claim that the term "INCLUDING ARBITRATION" in Purchase Orders No. 2–5 was ambiguous because Springs erroneously failed to transmit the backs of its order forms. If Rugmakers felt any such uncertainty, it was under an obligation to communicate it to Springs in light of the "Standard

Terms" sheet and their prior course of dealing.

Third, as the Second Circuit held in *Chelsea Square Textiles*, 189 F.3d at 290–91, 296–97, participants in the textile industry "generally [are] on notice that an agreement to purchase textiles is not only likely, but almost certain, to contain a provision mandating arbitration in the event of disputes, and must object to such a provision if it seeks to avoid arbitration." *Id.* at 296. Neither Rugmakers nor GMAC made any such objection. Thus, it would have been inconsistent with the trade practice for Rugmakers or GMAC to assume that the orders were *not* subject to the arbitration clause, especially in light of the Standard Terms and the explicit reference to arbitration in the short-form electronic orders.

### CONCLUSION

Because we find that the arbitration provision of the "Standard Terms and Conditions of Purchase" governed all of Springs' orders and is enforceable, we hereby order the parties to proceed to arbitration in North Carolina, pursuant to the arbitration clause's terms. *See* 9 U.S.C. § 4. Furthermore, because "the weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration", we also hereby dismiss the complaint. *Eastern Fish Co. v. South Pacific Shipping Co., Ltd.,* 105 F.Supp.2d 234, 241–42 & n. 10 (S.D.N.Y.2000) (citations omitted).

**IT IS SO ORDERED**.